Argued and submitted November 3, 2009, decision of Court of Appeals reversed; judgment of circuit court affirmed December 9, 2010

## STATE OF OREGON,
*Petitioner on Review /*
*Cross-Respondent on Review,*

*v.*

## CHARITY ANN ASHBAUGH,
*Respondent on Review /*
*Cross-Petitioner on Review.*

CC C052367CR; CA A131117;
SC S057189 (Control), S057188
(Consolidated for argument and opinion)

244 P3d 360

Paul L. Smith, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review/cross-respondent on review. With him on the brief was John R. Kroger, Attorney General.

Joshua B. Crowther, Senior Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review/cross-petitioner on review. With him on the brief was

Peter Gartlan, Chief Defender, Office of Public Defense Services.

Julia E. Markley and Lynne M. Paretchan, Perkins Coie LLP, Portland, and Chin See Ming, Legal Director, ACLU Foundation of Oregon, Inc., Portland, filed the brief for *amicus curiae* ACLU Foundation of Oregon, Inc.

GILLETTE, J.

Kistler, J., concurred and filed an opinion, in which Linder, J., joined.

Durham, J., specially concurred and filed an opinion.

Walters, J., dissented and filed an opinion.

**GILLETTE, J.**

This case concerns a criminal defendant's motion to suppress evidence obtained in a consent search of her purse. Defendant argued to the trial court that suppression was required because her consent to the search was a product of prior conduct on the part of the police that violated her rights under Article I, section 9, of the Oregon Constitution—specifically, an unreasonable and, therefore, unlawful, seizure of her person. The trial court rejected that argument but, on defendant's appeal, the Court of Appeals remanded for further factfinding, holding that the consent search was causally related to an encounter between defendant and the police and that, "depending on facts that neither party [had] developed at trial," the encounter may have been an unlawful seizure. *State v. Ashbaugh*, 225 Or App 16, 18, 200 P3d 149 (2008). We allowed both parties' petitions for review and now conclude that the trial court properly determined that defendant's consent to the search did not derive from an unlawful seizure and therefore did not violate Article I, section 9. Accordingly, we reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

The incident at the heart of this case occurred on a summer afternoon in a public park in Beaverton. Two police officers, Barroncliffe and Schaer, were patrolling in the vicinity of the park. They were armed and in uniform, and each was riding a department-issued mountain bicycle. As the two officers rode through the park, they observed defendant and her husband sitting on the ground under a tree. The officers had no reason to suspect defendant and her husband of criminal activity, but they thought it was "unusual" that a middle-aged couple like them would be sitting in that particular park at that time, because the park generally was frequented by children and elderly persons in the middle of the afternoon.

Barroncliffe and Schaer approached the couple and said to them: "Hey, you're not in any trouble, [but] do you have some I.D. we can see?" Both defendant and her husband handed over identification cards, which the officers proceeded to "run"[1] through the police dispatcher. According to

---

[1] Of course, to "run" identification means to have it reviewed by someone—normally a person located some distance from the place where the identification

both officers, their encounter with defendant and her husband was "relaxed."

After a two-minute wait (during which time the officers, defendant, and defendant's husband engaged in "casual conversation"), the officers learned that defendant's husband was the subject of a restraining order that prohibited him from having contact with defendant. Barroncliffe and Schaer reported what they had learned to defendant and her husband and told them that they were placing defendant's husband under arrest for violating the restraining order. The officers returned defendant's identification to her and then turned to the task of taking defendant's husband into custody.

The officers began that process by handcuffing defendant's husband and requesting by radio a car to transport the husband to jail. While waiting for the car to arrive, they talked with defendant and her husband about the restraining order. In the course of that conversation, defendant told the officers that she knew about the restraining order, that she and her husband were "trying to work it out," and that they were living together. When the car arrived, Barroncliffe and Schaer walked defendant's husband down a pathway and through a break in a chainlink fence that separated the park from the street (a distance of 35 to 50 feet), patted him down for weapons, and then placed him inside the car. Defendant remained under the tree during the approximately five minutes that it took to complete that process.

Barroncliffe and Schaer then returned to the area where defendant was waiting. Schaer told defendant that her husband had asked if she would take his belongings with her. Then (according to Schaer), "something inside of [Schaer] made [him] want to ask if [he] could look in [defendant's] purse." Whatever the source, Schaer surrendered to his

---

was tendered to the police—who is in a position to determine whether the person so identified is the subject, *inter alia*, of an outstanding warrant or other court order. This verbal specimen of law enforcement argot may be sufficiently enough understood in present day culture that it needs no explanation. It is not, however, the way courts or even the majority of individuals express themselves. We offer our explanation out of a recognition that, if we do not do so from time to time, we shall cause readers to believe what Mark Twain described in his preface to *Huckleberry Finn*, *viz.*, that "all [our] characters were trying to talk alike and not succeeding."

impulse and asked defendant "if she had anything illegal in her purse." She replied that she did not. Schaer then asked defendant if he could *search* her purse and defendant replied, "Yeah, sure." Schaer opened the purse and found a smudged mirror, several clear plastic baggies that each contained a small amount of clear crystalline substance, and some short straws. When asked about what he had found, defendant told Schaer that the substance was methamphetamine; she also made other incriminating statements. Schaer then cited defendant for possession of a controlled substance.

Before her trial on the possession charge, defendant moved to suppress all evidence obtained in connection with the search of her purse. She acknowledged that she had consented to that search, but argued that her consent was the direct product of a prior unlawful "stop," which occurred either when the officers asked her for identification or when the officers approached her a second time, asked her about the contents of her purse, and asked whether she would permit them to search it. Defendant asserted that, in either event, the evidence was obtained through illegal police conduct and must be suppressed.

The trial court rejected both arguments and denied the motion to suppress. After hearing the testimony of the two police officers and the arguments of the parties, the court opined that the issue resolved into two questions: First, could the state show that defendant's consent was independent of, or only tenuously related to, the initial encounter between defendant and the police, which the state had conceded was an unlawful stop?[2] Second, if defendant's consent to the search was independent of that initial stop, was defendant unlawfully seized *again* when Schaer asked for consent to search her purse? With respect to the first question, the trial court concluded that the unlawful stop did not significantly affect defendant's decision to consent to the search. Concerning the second question, the court held that the request for

---

[2] The trial court accepted the state's concession that the police officers had unlawfully stopped defendant when they obtained her identification and ran a record check. The trial court also accepted defendant's concession that her consent to the search of the purse was, in fact, voluntary. We have not been asked by the parties to reexamine either of those premises, and we do not.

consent to search was not a seizure at all but, instead, was "properly viewed as mere conversation." The trial court denied defendant's motion to suppress and, after a trial on stipulated facts, defendant was convicted.

On defendant's appeal, a divided Court of Appeals rejected the trial court's analysis and remanded for determination of certain facts that, in its view, were necessary to resolve the case under the proper analysis. The majority agreed with the trial court that the original, concededly unlawful stop did not require suppression of the evidence at issue,[3] but it was less sure about defendant's alternative argument that a separate unlawful stop occurred when Officer Schaer, "prompted only by 'something inside of [him],'" asked defendant if she had anything illegal in her purse and, then, whether she would allow him to search it. *Ashbaugh*, 225 Or App at 22. Noting that the essential question was whether the latter incident constituted a "stop," the majority sought to answer that question through application of this court's oft-quoted statement from *State v. Holmes*, 311 Or 400, 813 P2d 28 (1991), that a person is "seized" for purposes of Article I, section 9, of the Oregon Constitution:

> "'(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable under the circumstances.'"

*Ashbaugh*, 225 Or App at 22 (quoting *Holmes*, 311 Or at 409-10). After observing that the individual's subjective belief appeared to be a necessary element of a seizure under part (b)[4] of the quoted test, and that the trial court had not

---

[3] Like the trial court, the Court of Appeals' majority accepted the state's concession that the officers unlawfully seized defendant when they asked for her identification and ran a warrants check. The majority concluded, however, that defendant had failed to establish even a minimal causal connection between that unlawful seizure and her consent to the search of her purse. It noted that the warrant check of *defendant's* identification "came back negative, at which point defendant was free to leave." 225 Or App at 22.

[4] For lack of a better word, we identify the two sections of the *Holmes* definition as "parts"—that is, we refer to "part (a)" and "part (b)" of the definition. We do not mean to convey, by our use of that term, that the two sections of the definition set

resolved that issue, the majority remanded the case to the trial court to determine what defendant subjectively had believed at the relevant time. The majority instructed the trial court that, if it found that defendant in fact *did* believe that her freedom of movement had been restricted when Schaer asked her for consent to search her purse, then it must find that she was seized for constitutional purposes. That was so, in its view, because a reasonable person in defendant's position *could* have held that belief, fulfilling the objective reasonableness requirement of *Holmes* part (b). *Id.* at 25 (citing *State v. Toevs*, 327 Or 525, 535-36, 964 P2d 1007 (1998)).

A concurring opinion raised a concern about the latter point, questioning whether, to establish "objective reasonableness" for purposes of showing that a person has been seized under part (b) of the *Holmes* formulation, this court intended to require that a reasonable person *would* have believed their liberty had been intentionally and significantly restricted, or only that such a person *could* have held that belief. In the end, the concurrence decided to "take [this court] at its word in *Toevs* that it is enough to [show] that a reasonable person in defendant's position *could* * * * believe that the officers significantly had restricted her liberty." 225 Or App at 32 (Brewer, C. J., concurring) (emphasis in original).[5]

Two judges dissented. The dissent maintained that the majority had erred in remanding for a determination of defendant's subjective state of mind when there was no evidence in the existing record pertaining to that subject and no lawful way of obtaining evidence of that sort, because the state could not compel defendant to testify regarding her state of mind. The dissent summed up its concern in the following terms:

---

out elements that both must be present. Rather, as the use of the word "or" in the *Holmes* definition implies, "part (a)" and "part (b)" are alternative methods for establishing, together or alone, that conduct or circumstances constitute a seizure.

[5] A second concurring opinion agreed with the majority that the case should be remanded for factfinding on defendant's subjective state of mind, but declined to express any view as to whether a reasonable person could feel detained under similar circumstances. *See* 225 Or App at 32-33 (Landau, J., concurring).

"Admittedly, it is unclear what circumstances the *Holmes* court had in mind when it interpreted Article I, section 9, to embody a type (b) analysis, but the court could not have contemplated a process where the state is effectively unable to litigate the issue that has been framed by the majority as determinative of the outcome of this case and where the trial court is required to make a finding that is impossible for it to make."

225 Or App at 36 (Edmonds, J., dissenting). As noted, both the state and defendant petitioned for review of the Court of Appeals' decision; we allowed both petitions.

Before this court, defendant argues that the Court of Appeals erred in remanding the case to the trial court for factfinding with respect to whether, when Schaer asked for consent to search her purse, defendant subjectively believed that her liberty had been significantly restricted. She contends that, under a correct interpretation of the *Holmes* analysis previously described, establishing whether an individual *subjectively* believes that he or she has been "seized" is unnecessary when a court is able to say that, under the same circumstances, a reasonable person would have held that belief. The state argues, on the other hand, that the Court of Appeals went astray by attempting to apply the *Holmes* formulation at all, because, in its view, this court has abandoned that formulation and now applies an "objective indicia" test. The state urges that, if an "objective indicia" test is applied to the circumstances here, Schaer's request for consent to search defendant's purse was not a seizure.

As the parties' positions and the several opinions generated in the Court of Appeals reflect, there is considerable confusion about the meaning and continuing viability of the definition of a "seizure" set out in *Holmes*. The confusion is warranted: Although this court has repeatedly pointed to *Holmes* as setting out the essential test for when a seizure has occurred, it has not yet successfully differentiated between the two methods for establishing a seizure that are mentioned in that test. Neither has this court attempted to confront the purely practical concerns that an inquiry into a criminal defendant's "subjective belief" (which the *Holmes* part (b) definition appears to involve) obviously raises.

Clearly, there is a need for us to clarify that element of an Article I, section 9, "seizure."

But that issue must come—if it is to come at all—later in our review. We begin with defendant's *original* theory for suppression, *viz.*, that defendant's consent to the search of her purse arose out of an unlawful stop that occurred when, without any reasonable basis for suspecting that she was involved in criminal activity, Barroncliffe and Schaer requested identification from defendant and used the identification that she produced to run a warrants check. Because the state has conceded that the request for identification to check for warrants amounted to an unlawful seizure,[6] the question for this court respecting defendant's original theory is whether, and in what way, the evidence obtained in the search of defendant's purse derived from that unlawful conduct.

In *State v. Rodriguez*, 317 Or 27, 38-40, 854 P2d 399 (1993), this court observed that, in criminal prosecutions in Oregon, evidence is subject to suppression if it is obtained in violation of the defendant's personal right under Article I, section 9, to be free from unlawful searches and seizures. Based on that observation, we concluded that unlawful police conduct with respect to an individual provides a basis for suppression of evidence seized during a search performed with the consent of that individual in one of two ways: (1) the unlawful police conduct affected the supposed voluntariness of the individual's consent; or (2) the consent actually derived from, or was obtained through "exploitation" of, the prior violation of the individual's constitutional rights.[7] As noted,

---

[6] As noted previously, 349 Or at 302 n 2, in light of the state's concession, we express no opinion on the issue.

[7] In *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), this court explained the latter theory, sometimes referred to as an "exploitation" theory, in terms of the rationale underpinning Oregon's exclusionary rule and of the state's usual burden, when police misconduct is shown, of proving that evidence is not tainted by the misconduct:

"[E]ven when a defendant's consent is voluntary—that is, when the defendant's free will has not been overcome by police coercion—that consent is insufficient to establish the admissibility of evidence from a warrantless search if the state cannot prove that the consent was independent of, or only tenuously related to, any preceding violation of defendant's rights under Article I, section 9. Unless the state is able to make that showing, then the defendant's consent cannot operate to validate a warrantless search because the defendant's

defendant has never argued that her consent in this case was not voluntary, and that issue therefore need not be considered. That leaves the issue of "exploitation," *i.e.*, whether the consent search in some sense *derived* from the prior unlawful police stop.

In the present case, the Court of Appeals' majority concluded that defendant had failed to shift the burden of proof on the issue of "exploitation" to the state, because the officer's unlawful actions as to *defendant*

> "had no causal relationship with the discovery of evidence; [the] check [of defendant's identification] came back negative, at which point defendant was free to leave. The warrant check that was causally related to the discovery of evidence was the one that police carried out on defendant's husband; that act, a violation of *his* rights, led to the discovery of the outstanding restraining order, the arrest, and the subsequent events. The violation of *defendant's* rights simply had no downstream consequences."

225 Or App at 22 (emphasis in original).

■ In our view, the first sentence of that analysis makes the essential point: Defendant was free to leave—and the unlawful stop was over as to her—when the police returned her identification and told her that they were arresting her husband.[8]

■ Neither can the fact that defendant remained in the vicinity while the officers effected the arrest of defendant's husband—thereby making herself available for further conversation—be viewed as causally related to the unlawful request for identification and warrant check. Although defendant could be correct that, *in theory*, a causal connection *might* exist between an unlawful stop that has ended and an individual's subsequent consent to a search, the existence of

---

consent *itself* derived from a violation of the defendant's rights under that state constitutional provision. To not require suppression in such circumstances would be inconsistent with the * * * rationale underlying the Oregon exclusionary rule, that is, to place a defendant in the same position as if the government officers had acted within the bounds of the law."

*Hall*, 339 Or at 27-28 (emphasis in original; citations omitted).

[8] Because the first sentence of the Court of Appeals' statement contained the full legal answer to defendant's argument, we need not discuss whether the balance of the quoted statement is correct or adds anything to the analysis.

that possibility does not absolve a person seeking suppression of evidence on an "exploitation" theory from the person's burden of identifying an *actual* factual link. Defendant here has not identified any actual link, and her vague suggestion that the two events are "plausibly related" is insufficient to meet her burden.[9] It follows that the officers' request for identification and use of that identification for a warrants check, which concededly constituted an unlawful stop, cannot serve as a basis for granting defendant's motion for suppression of evidence obtained in the subsequent consent search of her purse.

That brings us to defendant's alternative theory for suppression, *viz.*, that she was subjected to a *second* seizure when Schaer approached her and questioned her about the contents of her purse. Defendant contends that that seizure was unlawful because, at that time, Schaer had no basis for believing that defendant had engaged in any criminal activity.[10] In fact, the state does not dispute defendant's contention that her consent to the search was the direct product of Schaer's question and request. The state argues, instead, that Schaer's question and request were "mere conversation," not a "seizure."

■       The issue that the state raises—whether a putatively unreasonable "seizure" was in fact "mere conversation" with no constitutional implications—is a familiar one to this court. We long have recognized that, out of the broad range of potential encounters between police and citizens, only some implicate the prohibition in Article I, section 9, against unreasonable "seizures." We have divided police-citizen encounters, very roughly, into three categories: (1) "mere conversation," that is, noncoercive encounters that are not "seizures" and, thus, require no justification under Article I, section 9; (2) "stops," a type of seizure that involves a temporary

---

[9] The circumstances that we describe here are notably distinct from those in *State v. Ayles*, 348 Or 622, 237 P3d 805 (2010), where this court concluded that the existence of a different circumstance—the police request for consent to search occurred *while an illegal detention was ongoing*—was sufficient to establish the requisite minimal factual nexus. *Id.* at 633-34.

[10] Defendant also contends that the existence of a causal connection between *that* seizure and her decision to consent is beyond dispute. As our analysis will demonstrate, we need not address that theory in this case.

restraint on a person's liberty and that violates Article I, section 9, unless justified by, for example, necessities of a safety emergency or by reasonable suspicion that the person has been involved in criminal activity; and (3) "arrests," which are restraints on an individual's liberty that are steps toward charging individuals with a crime and which, under Article I, section 9, must be justified by probable cause to believe that the arrested individual has, in fact, committed a crime. The thing that distinguishes "seizures"—that is, "stops" and "arrests"—from encounters that are "mere conversation" is the imposition, either by physical force or through some "show of authority," of some restraint on the individual's liberty. *State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010); *see also State v. Warner*, 284 Or 147, 161-62, 585 P2d 681 (1978) (to the same effect).

In addition to the foregoing explication of the meaning of the constitutional term "seizure," this court has set out a definition of that term in *Holmes*. Although we already have quoted that definition, 349 Or at 303, we do so again for the convenience of the reader:

> "[A] 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable under the circumstances."

*Holmes*, 311 Or at 409-10.[11]

A full appreciation of the foregoing definition requires that we recognize that it is not the only advice that the court in *Holmes* provided with respect to determining when a "seizure" has occurred. The court also stated that the determination "require[s] a fact-specific inquiry into the

---

[11] In *Rodgers/Kirkeby*, we stated the definition in slightly different words:

"A person is 'seized' under Article I, section 9, when either (1) a police officer intentionally and significantly interferes with the person's freedom of movement; or (2) the person believes, in an objectively reasonable manner, that his or her liberty of movement has been so restricted."

347 Or at 621-22.

totality of the circumstances of the particular case," *id.* at 408, and it stressed that,

> "[u]nder the[ ] 'seizure' standards [set out above], law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9, 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.,* policeman tapping citizen on the shoulder at the outset to get a citizen's attention). * * * Rather the encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries [that] a private citizen would not, has otherwise conducted himself in a manner that would be perceived as nonoffensive conduct if it had occurred between two private citizens."

*Id.* at 410.

As noted, this court's efforts to explain what the constitutional term "seizure" embraces have not yet succeeded: Our various explanations, from *Holmes* to *Rodgers/Kirkeby*, have left questions unanswered. We shall make a further effort here.

One such question is the one that the state poses—whether the two-part *Holmes* definition quoted above remains relevant almost 20 years after it first was announced. The state contends that, after an initial period during which this court seemed to analyze police encounters under both parts of the definition, the court shifted to a pattern in which it quoted, but did not actually address, both parts of the *Holmes* definition.[12] The state contends that that

---

[12] We discuss below the cases that the state points to as demonstrating that shift.

shift demonstrates that the court has abandoned the two-part *Holmes* formulation and, it argues, the court now resolves "seizure" questions in terms of whether, looking at the "totality of the circumstances" of the particular case, a police officer's conduct and words significantly interfered with the defendant's freedom of movement. The state suggests, moreover, that the court was correct to shift to a simple "totality of the circumstances" approach, because the "formulaic" and "mechanical" *Holmes* construct "ignores the complexity and nuance of encounters between law enforcement and individuals."

Before this court, the state also criticizes the Court of Appeals' majority's handling of another aspect of *Holmes* part (b)—the discussion whether an individual involved in an encounter with police "believes" that his or her liberty has been restricted. That argument fairly characterizes what the Court of Appeals majority said. After concluding that a reasonable person *could* have believed that his or her liberty had been restricted under the circumstances of the case, and after noting that the trial court had not made any finding as to whether defendant *actually* held such a belief, the Court of Appeals remanded the case to the trial court to make what it deemed to be the necessary finding concerning that question and, at the same time, seemed to place the burden of establishing defendant's subjective belief on the state. Taking its cue from the Court of Appeals' dissent, the state argues that that approach has placed it in an untenable position—one of being "effectively unable to litigate [an] issue that has been framed by the majority as determinative." *Ashbaugh*, 225 Or App at 36 (Edmonds, J., dissenting). That is so, in the state's view, because (1) a defendant cannot be compelled to testify about his or her state of mind and (2) in the absence of such testimony, the defendant's subjective belief that he or she has been seized is presumed—unfairly—from the fact that he or she has remained in the presence of the police. The state concludes that, if a citizen's subjective beliefs about an encounter properly determine whether there has been an Article I, section 9, "seizure," then the defendant, rather than the state, should be required to carry the burden of proof with respect to those beliefs.

Defendant, for her part, embraces the idea that *Holmes* part (b) has a subjective focus, and agrees with the Court of Appeals' majority that, for purposes of part (b), the objective reasonableness of an individual's belief that his or her liberty has been significantly restricted must be based on whether *a* reasonable person *could* hold that belief. Defendant argues, however, that part (a) of the *Holmes* test *also* assesses the circumstances entirely from the affected individual's personal and subjective vantage point—although, under part (a), the question is not what a reasonable person *could* believe but "whether, under the totality of the circumstances, a reasonable person *would* consider the officer's conduct a significant restriction on the person's liberty."[13]

The fact that the parties have advanced such vastly different interpretations of the two-part *Holmes* formulation might be viewed as a failure by this court in *Holmes* to articulate its point clearly. But, as we have focused more and more tightly on the words of the *Holmes* definition of "seizure," it has become increasingly apparent that the problem is not so much with how the idea has been expressed as with the idea itself. Quite simply, we think that at least one component of the *Holmes* definition is unworkable, and this court since *Holmes* has proceeded as if the unworkable component were not there. Although that approach has resulted in confusion about the meaning of *Holmes*, we do not believe that the root problem can be resolved by further effort at clarification. We believe that the problem instead requires a reexamination of the *Holmes* formulation.

It is evident that, when this court adopted the *Holmes* definition, it was attempting to define Article I, section 9, seizures primarily in terms of the perceptions of ordinary citizens. That is not surprising: The United States

---

[13] In fact, defendant contends that whenever this court has stated, in the context of a *Holmes* analysis, that an "objectively reasonable" person would believe that his or her liberty has been restricted, it has been applying part (a) of the *Holmes* formulation, rather than part (b). Given that the phrase "objectively reasonable" appears in part (b) of the Holmes formulation, defendant's theory is counterintuitive. The same might be said about another aspect of defendant's interpretation of the *Holmes* formulation—her claim that, when part (a) speaks of an officer "intentionally" restricting an individual's liberty, it is not concerned with the police officer's *actual* intentions, but with what a reasonable person in the suspect's position would believe that the officer intended.

Supreme Court had, at that time, settled on a definition of "seizure," for the purpose of the Fourth Amendment to the United States Constitution, that was couched in terms of a reasonable person's perceptions:

> "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

*United States v. Mendenhall*, 446 US 544, 554, 100 S Ct 1870, 64 L Ed 2d 497 (1980) (plurality opinion by Stewart, J.). *See also Florida v. Royer*, 460 US 491, 502, 103 S Ct 1319, 75 L Ed 2d 229 (1983) (quoting *Mendenhall* plurality). This court was aware of the United States Supreme Court's "reasonable person" approach in *Mendenhall*,[14] but it likely also was aware that courts and academics across the country were struggling with two pertinent issues: (1) how to deal with individual differences between arguably reasonable persons involved in citizen-police encounters;[15] and (2) how to deal with the stated or inferred intentions of police officers in such encounters.[16] We are satisfied that, when this court

---

[14] The court quoted the "reasonable person" definition elsewhere in *Holmes*. 311 Or at 413.

[15] *See, e.g.*, Tracey Maclin, *Black and Blue Encounters—Some Preliminary Thoughts about Fourth Amendment Seizures: Should Race Matter?*, 26 Val U L Rev 243 (1991) (because, historically, "special dynamic" has surrounded encounters between police and black males, court should consider how the race of the person confronted by the police might have influenced his attitude toward the encounter); Wayne R. LaFave, 3 *Search and Seizure; A Treatise on the Fourth Amendment* § 9.2(h) at 407-08 (2d ed 1987) (briefly discussing and rejecting the possibility that reasonable person standard depends upon the subjective perceptions of the suspect). *See also In re J.M.*, 619 A2d 497, 504-07 (DC App 1992) (Chief Judge Rogers and Senior Judge Mack concurring in part and dissenting in part) (child's perception of police encounter will be different from adults, and that difference should be taken into account when court is confronted with deciding whether police encounter with child was a seizure).

[16] *See, e.g.*, Edwin J. Butterfoss, *Bright Line Seizures: The Need for Clarity in Determining When Fourth Amendment Activity Begins*, 79 J Crim L & Criminology 437, 464-66 (1988) (more realistic to take into account the subjective intent of the police officer because, when police officer does not intend to permit person to leave, person in fact is not free to leave); LaFave, 3 *Search and Seizure* § 9.2(h) at 407 (briefly discussing propriety of considering subjective intentions of police officers). *See also State v. Shy*, 373 So 2d 145, 148 (La 1979) (Dennis, J. dissenting) (when police had admitted in their testimony that they would have stopped defendant by force if he had attempted to leave, "it is legalistic, but not realistic, to pretend that an ordinary citizen would be aware of or believe in, much less rely upon the * * * shibboleth" that nothing prevents a person who is approached by police from choosing to walk away).

defined Article I, section 9, "seizures" in *Holmes*, it intended to use the "reasonable person" construct of *Mendenhall* but, at the same time, to address and resolve the two concerns arising out of *Mendenhall* that we have mentioned. Of particular relevance here, we believe that *Holmes* part (b) was directed at the latter concern.

However, having announced in *Holmes* part (b), that the existence of a seizure might depend on the subjective impressions of the citizen involved, this court has seemed disinclined to use that aspect of the part (b) formulation in its decisions. Even in *Holmes* itself, the court glossed over the subject of the defendant's subjective beliefs about his encounter with the police, and concentrated entirely on what a reasonable person would have believed in the circumstances. *See Holmes*, 311 Or at 411 (concluding that there had been no seizure because a reasonable person would appreciate being stopped and advised of traffic situation and would not believe that associated inconvenience or restriction was significant). And, since *Holmes*, a disinclination even to mention a suspect's subjective beliefs in connection with a part (b) analysis has been a common pattern in this court's cases. *See, e.g., State v. Gerrish*, 311 Or 506, 513, 815 P2d 1244 (1991) (holding that police did not seize defendant when they flagged him down to request information because that action not significant restriction upon the defendant's liberty, "nor would a reasonable individual believe that it was"); *State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005) (concluding that police seized defendant when they took defendant's identification for warrant check, because reasonable person would not feel free to leave when person is subject of pending warrant check); *State v. Thompkin*, 341 Or 368, 378-79, 143 P3d 530 (2006) (same).[17]

In the handful of cases in which the defendant's subjective beliefs even are mentioned in connection with a part (b) analysis, this court sometimes has avoided any actual

---

[17] The noted tendency in this court's cases to avoid using or even mentioning the defendant's subjective beliefs in connection with a *Holmes* part (b) analysis is different from the state's idea that this court has tacitly abandoned the two-part *Holmes* formulation altogether. The cases do, however, manifest the tendency to remove subjective belief from the part (b) analysis that we have observed.

inquiry into the defendant's beliefs by accepting, for the purpose of argument, that the defendant subjectively believed that he had been seized. *See, e.g., State v. Ehly,* 317 Or 66, 79-80, 854 P2d 421 (1993) (assuming that defendant did not believe that he was free to leave but holding that, in any event, an objectively reasonable person would not share that belief). At other times, the court simply has assumed that a defendant's failure to assert himself shows that he subjectively believed that he had been seized. *See, e.g., State v. Dahl,* 323 Or 199, 207-08, 915 P2d 979 (1996) (defendant's submission to police order, conveyed telephonically, to come out of his house with his hands up showed that he believed that his liberty had been restricted).

In fact, this court has treated a defendant's subjective belief that his or her liberty has been intentionally and significantly restricted as a separate and necessary element of a *Holmes* part (b) seizure in only one case—*Toevs.*[18] Significantly, *Toevs* is the case that the Court of Appeals relied on when it remanded to the trial court to determine what defendant subjectively believed.

In *Toevs,* this court opined that, for purposes of the *Holmes* formulation, what a defendant subjectively believes is a question of fact to be resolved by the trial court, while whether that belief is objectively reasonable requires an independent assessment of the facts by the reviewing court. 327 Or at 535. In *Toevs,* this court understood the trial court to have found that the defendant subjectively believed that his freedom of movement had been restricted at the relevant time, and noted that that finding was supported by the record. *Id.* at 536. This court then proceeded to independently assess whether the defendant's belief was objectively reasonable, and stated its conclusion in that regard in the following terms:

---

[18] *State v. Juarez-Godinez,* 326 Or 1, 942 P2d 772 (1997), also appears to treat the defendant's subjective belief as a separate and necessary element of a part (b) analysis. However, *Juarez-Godinez* is complicated by the fact that the court appeared to employ both a part (a) and a part (b) analysis, without distinguishing between them, and by the further fact that the case involved the seizure of an automobile, not a person. 326 Or at 6-10.

> "Under the totality for the circumstances, we conclude that a reasonable person in defendant's position *could have believed* that the officers significantly had restricted his liberty or freedom of movement."

*Id.* (emphasis added). The use of the phrase *"could have believed"* in that sentence clearly is an anomaly. In every other case in which this court has purported to apply *Holmes*, including those that were issued after *Toevs*, the court's conclusions have been phrased in terms of what a reasonable person "would" have believed. *See, e.g., Hall*, 339 Or at 19; *Thompkin*, 341 Or at 378. The trend, not the anomaly, describes the question correctly. "Would" is correct; "could" was a regrettable misstatement.

■ For the foregoing reasons, we believe that it is time to abandon forthrightly the subjective component of that part of the *Holmes* part (b) test—that is, the part that is concerned with a person's subjective belief that he or she has been seized—and instead to direct the focus of that part of the definition entirely to an objective standard.[19] A "seizure" of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred.[20]

■ Applying that standard to the facts in this case, we conclude that defendant was not seized within the meaning

---

[19] We describe our concern so narrowly because we are of the view that one other example of subjective belief *might* remain relevant: If a person affirmatively (but wrongly) believes that he or she is free to go, his or her consent to a search may be valid. This case does not present the question—we simply note here that it remains unanswered.

[20] The controversy in the present case focuses on the "objective reasonableness" and subjective "belief" aspects of part (b) of the *Holmes* standard and we have limited our analysis of the standard accordingly. We recognize that, in the eyes of some readers, part (a) of the standard contains a "subjective" element that is susceptible to the same criticisms as is the subjective element of part (b)—specifically, the reference to law officers "intentionally" restricting a person's freedom of movement. Although our present sense is that the intentionality aspect of part (a) is quite different from the subjective belief aspect of part (b) and serves a different and more defensible purpose, we are open to any argument to the contrary that the state or any other party might wish to make in a future case.

of Article I, section 9, when Schaer recontacted her after putting her husband in a police car, asked her about the contents of her purse, and asked whether she would permit him to search the purse. Although it is possible to restrict a person's liberty and freedom of movement by purely verbal means, there is no evidence that would support a conclusion that that is what happened here. Certainly, the *content* of Schaer's questions did not cause defendant to be seized: As we repeatedly have observed, even though Schaer asked defendant a question that one private citizen ordinarily would not ask another, defendant does not point to anything about Schaer's words that would be perceived as "show of authority that restrict[ed her] freedom of movement." *Rodgers/Kirkeby*, 347 Or at 622.

Neither is there any basis for concluding that Schaer's manner or actions involved a "show of authority." Schaer's request was not accompanied by any physical action that could be construed as threatening or coercive—he did not, for example, position himself and his fellow officer in a way that would suggest to defendant that she was surrounded. *See Rodgers/Kirkeby*, 347 Or at 627 (illustrating that tactic). In fact, the trial court found that the conversation between Schaer and defendant was "relaxed and nonconfrontational," and we are bound by that finding, because there is evidence in the record to support it. Moreover, the officers had returned defendant's identification to her and left her alone while completing the arrest and transportation of her husband. Thus, while it may have been true that defendant had been unlawfully detained by police some minutes before and had watched a clear show of authority directed at her husband, those circumstances had ended. They did not create the kind of atmosphere that would convey to a citizen that she was not free to go at the later time.

Considering the totality of the circumstances, we conclude that Schaer's actions in asking defendant the questions that he did under the circumstances that existed did not "intentionally and significantly" restrict or interfere with her liberty. We further conclude that an objectively reasonable person in defendant's circumstances would not believe that Schaer had done so. Accordingly, we reject defendant's contention that, in light of the surrounding circumstances,

Schaer's questions about the contents of her purse and his request for consent to search the purse amounted to a seizure for purposes of Article I, section 9, of the Oregon Constitution. It follows that, whatever connection there might be between those questions and defendant's consent to the search of her purse, the consent was not the product of an unlawful seizure.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**KISTLER, J.,** concurring.

I join in the majority opinion in this case. I also agree with the principle stated in Justice Durham's concurring opinion that defendant's voluntary consent provides an alternative basis for affirming the trial court's judgment.

Linder J., joins in this concurring opinion.

**DURHAM, J.,** specially concurring.

I agree with the majority that the trial court correctly denied defendant's motion to suppress the evidence, and that defendant's conviction should be affirmed. However, I do not agree with the majority's explanation of its reasons for affirming defendant's conviction. I would decide this case on narrower and, I submit, simpler grounds.

The only question that this case poses is whether the police officers conducted an unreasonable search when they examined the interior of defendant's purse and saw drug paraphernalia. If that search was lawful, then the officers' subsequent observations supplied them with probable cause to seize the drug evidence.

The state defends the police search here on the ground of consent. A citizen's voluntary consent to a police search is an exception to the requirement of a search warrant. A valid consent confirms, for legal purposes, that the resulting search is reasonable and does not violate the citizen's rights under Article I, section 9, of the Oregon Constitution. *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994). Courts must examine the totality of the evidence to determine whether the citizen consented to the search voluntarily, rather than as the result of police coercion, express

or implied. *State v. Parker*, 317 Or 225, 230, 855 P2d 636 (1993).

In this case, two aspects of the trial court record greatly simplify the court's examination of the consent issue. First, defendant admitted that she consented to the search of her purse by the police. Second, defendant also conceded that her consent to the search of her purse was voluntary. The majority and the dissent give almost no attention to those significant admissions. To me, however, those admissions dispose of all or virtually all of defendant's arguments that the search of her purse was unreasonable.

The majority and the dissent focus instead, at agonizing length, on whether the two police officers interfered with defendant's freedom of movement, that is, whether they "seized" her, during either of their two encounters with her in the park. As it turns out, the seizure issue ultimately does not matter in this case, however the court decides it. I will briefly explain why that is so.

In the consent search context, a defendant commonly challenges the voluntariness of consent by pointing to evidence that the police had restrained the defendant's liberty of movement at or before the moment when the alleged consent was granted. A restraint on liberty is relevant to the validity of consent in that kind of case. By establishing that the police first seized the defendant, the defendant can argue that the seizure (and any other coercive circumstances) overcame his or her free will and rendered any subsequent statement of consent involuntary.

That argument, however, is beside the point here because of defendant's concessions, noted above. Even if the police encounter with defendant amounted to a stop or an arrest, the trial court correctly declined to treat it as having a coercive influence on defendant because defendant stipulated that her consent to the search of her purse was voluntary.

One other argument merits discussion. Evidence seized by police will be treated as "fruit of the poisonous tree" and suppressed if the police commit an illegality, such as an invalid stop or arrest, and subsequently exploit that illegality

to obtain the disputed evidence. *State v. Rodriguez*, 317 Or 27, 38, 854 P2d 399 (1993). Under that theory, it is not sufficient that the initial illegality stands in a mere "but for" causal relationship to the seized evidence. Other causal factors can intervene to lead the police to the evidence. Evidence remains "fruit of the poisonous tree" and subject to suppression only if the initial police illegality, when compared to other intervening causal factors, was the reason for the discovery of the evidence by the police. *Id.* at 39-40; *State v. Hall*, 339 Or 7, 45, 115 P3d 908 (2005) (Durham, J., concurring in part and dissenting in part).

Defendant argues that the evidence seized here was the result of police officers' exploitation of the unlawful stop or arrest of defendant in their first or second encounter (or both) with her. But the facts do not demonstrate the required sort of exploitation. Rather, according to the evidence, the event that brought the disputed evidence to light was defendant's voluntary consent to a search of her purse. Even if the police encounter with defendant began with an invalid stop or arrest, the facts establish that her voluntary consent exposed the evidence to the police and that the initial stop or arrest did not compel her to consent to the search of her purse.

For the reasons expressed above, the majority reaches a correct conclusion about defendant's exploitation theory, even though my analysis of that theory differs significantly from that employed by the majority. And, as noted, the majority's ultimate answer here—that the trial court properly denied defendant's motion to suppress evidence—is correct.

I concur.

**WALTERS, J.,** dissenting.

When uniformed police officers have no reasonable suspicion that a citizen is engaged in criminal activity, do those officers violate Article I, section 9, of the Oregon Constitution when they approach that citizen and, after obtaining her identification and checking for warrants, question her about whether she is committing a crime and whether they can search her purse for evidence of that crime?

I conclude that officers who engage in that conduct seize the citizen in violation of the Oregon Constitution because a reasonable citizen subjected to that inquiry could conclude that the officers' legal show of authority restrained that citizen's liberty. Because the majority reaches the opposite conclusion, without a reasoned basis for doing so, I respectfully dissent.

In this case, the state conceded, and the majority proceeds on the assumption, that the officers seized defendant and violated her rights under Article I, section 9, when, without reasonable suspicion that she was engaged in criminal activity, they approached her, obtained her identification, and checked for outstanding warrants. 349 Or at 302 n 2, 306 n 6. That conclusion is compelled by this court's decision in *State v. Hall*, 339 Or 7, 18, 115 P3d 908 (2005). In *Hall*, an officer requested, obtained, and returned the defendant's identification card and radioed for a warrant check. The court held that, when the officer did so, he restrained the defendant's liberty of movement and seized the defendant because it is "difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check." *Id.* at 19.

I do not see a constitutional distinction between subjecting a person to a check for outstanding warrants and subjecting a person to a check for illegal drugs. If a reasonable person in the former position would not feel free to leave, why would a reasonable person in the latter position be more bold?

Furthermore, this court previously has decided that, when the police obtain a citizen's identification and subject him to an investigation for robbery, they seize him. *State v. Warner*, 284 Or 147, 585 P2d 681 (1978). In *Warner*, the police approached the defendant to investigate a robbery, and

"this court held that, at the moment that the officer told the defendant to place his identification card on the table and advised the defendant that he was the subject of a criminal investigation [for robbery], the officer had seized the defendant by a *show of authority* for purposes of ORS 131.615

(1975), *amended by* Oregon Laws 1997, chapter 866, section 1, and Article I, section 9. [284 Or at 165]."

*Hall*, 339 Or at 18 (emphasis added).[1]

In *State v. Thompkin*, 341 Or 368, 143 P3d 530 (2006), this court applied the rule of *Warner* and *Hall* to a person who was the subject of a drug investigation. In *Thompkin*, the police lawfully stopped a car in which the defendant was a passenger. The court held that the police unlawfully seized the defendant when one officer requested and retained his identification to conduct a records check while another questioned him concerning drugs and weapons. The court said,

> "Here, as in *Hall*, we find it doubtful that a reasonable person in defendant's position would think that he or she was free to leave at a time when that person was the investigatory subject of a pending warrant check *and was being questioned about illegal activity*."

*Id.* at 378-79 (emphasis added).

This court's most recent seizure case, *State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010), is in accord. In that case, an officer lawfully stopped the defendant, Rodgers, a motorist, to investigate a traffic infraction, obtained and returned his driver's license, and completed a check for outstanding warrants, finding none. Then, without advising the defendant that that investigation had been completed, one officer asked the defendant about the contents of two containers that the officer had observed in the car and whether the officer could search the car, while the other officer stood at the passenger side of the car.

The court held that, although the police had reasonable suspicion to stop the defendant and question him about the traffic violation, they seized him without reasonable suspicion and violated his rights under Article I, section 9, when they engaged in a "show of authority" after the traffic investigation was, or should have been, complete. *Id.* at 622. In

---

[1] In *Hall*, the court also noted that in *State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981), a case in which "two police officers approached the defendant as he was preparing to exit the Portland airport and informed him that they had information that he might be in possession of illegal drugs," the court assumed that the police interaction with the defendant was unlawful. *Hall*, 339 Or at 30-31.

reaching that conclusion, the court first noted that when a police officer uses official authority to stop and question a citizen, the citizen is legally required to obey and "interact with" the police officer. *Id.* at 623 (citing ORS 811.535 (failure to obey a police officer), ORS 807.570 (failure to carry or present a license), and ORS 807.620 (prohibiting giving false information to police officer)). The police therefore seized the defendant when they stopped him and investigated the traffic violation. When that investigation was complete, the officers did not tell the defendant that he was free to go and therefore continued to seize him. Because they did so without reasonable suspicion that the defendant was involved in criminal activity, the police violated the defendant's rights under Article I, section 9. The court observed that the defendant "had no way of knowing that [the officer's] questions and request to search the car were not part of the traffic investigation and that his cooperation in [the drug] investigation was not required to continue." *Id.* at 626.

The other defendant in that case, Kirkeby, also a motorist, got out of his car after he was stopped by a deputy and voluntarily produced his driver's license. The deputy knew that the defendant was driving with a suspended license, but did not question him about that violation or issue a citation. Instead, the deputy, concerned for his safety, asked the defendant if he had any weapons. When the defendant denied that he did, the deputy asked if he could conduct a patdown search of the defendant. The defendant agreed and, after conducting the search, the deputy was confident that the defendant was not armed. Nevertheless, the deputy asked the defendant for permission to examine the contents of his pockets. The court held that the "deputy's show of authority that accompanied his request that [the] defendant consent to a patdown and subsequent request that [the] defendant consent to an examination of the contents of [the] defendant's pockets" was "a significant limitation on [the] defendant's freedom of movement" and constituted a seizure under Article I, section 9. *Id.* at 628.

Here, had the majority applied the reasoning of its prior cases, it would have concluded that defendant was similarly seized and that her rights under Article I, section 9, were similarly violated. Applying *Hall*, *Warner*, and *Thompkin*, the majority would have concluded that defendant was seized

because the police obtained her identification and subjected her to a criminal investigation, and it is "difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a [criminal investigation]," *Hall*, 339 Or at 19, or "[is] being questioned about illegal activity," *Thompkin*, 341 Or at 379.

Applying *Rodgers/Kirkeby*, the majority would have concluded that defendant was seized because, after their initial seizure of defendant, the officers did not tell her that she was free to go, and she "had no way of knowing that [the officer's] questions and request to search [her purse] were not part of the [initial investigation] and that [her] cooperation in [the drug] investigation was not required to continue." 347 Or at 626. Applying *Rodgers/Kirkeby*, the majority also would have concluded that the officer's "show of authority" in requesting consent to search constituted a seizure. 347 Or at 628.

Instead of reaching any of those conclusions, the majority declares that the officer who questioned defendant did not engage in a "show of authority" that would "convey to a citizen that she was not free to go." 349 Or at 317. Of the contrary cases that I have cited, the majority attempts to distinguish only *Rodgers/Kirkeby*. The majority asserts that this case is different from *Rodgers/Kirkeby* because the officers in this case did not position themselves in a way that "would suggest to defendant that she was surrounded." 349 Or at 317.

That distinction fails for two reasons. First, there was no evidence in *Rodgers/Kirkeby* that the defendant Kirkeby was "surrounded" by the *one* officer who questioned him, and the defendant in this case was at least as "surrounded" by the *two* officers who questioned her as was the defendant Rodgers in *Rodgers/Kirkeby*. This defendant was seated on the ground when two officers who had just arrested and handcuffed her husband continued to question her. If Rodgers, who was at the wheel of a car and could drive it away, was restrained by two officers who stood near the car, then defendant in this case, who was without a similar means of departure, also was restrained by the two officers who stood near her.

Second, although the court in *Rodgers/Kirkeby* noted the positions of the two officers who questioned the defendant Rodgers in its account of the "totality of the circumstances" that affected him, the court did not take note of the position of the one officer who requested the defendant Kirkeby's consent to search, or comment that the officer had physically restrained him. The court focused, as did the courts in *Warner*, *Hall*, and *Thompkin*, not on the physical, but on the legal "show of authority" that the police exhibited and exerted when they subjected those defendants to questioning. In this case, the officers, like those in *Rodgers/Kirkeby* and the cases leading up to *Rodgers/Kirkeby*, were in uniform, obtained defendant's identification, and subjected defendant to legal obligations parallel to those that the court found pertinent in *Rodgers/Kirkeby*. *See* ORS 811.535 (failure to obey a police officer); ORS 162.247(1)(b) (failure to obey a peace officer); and ORS 162.385 (prohibiting giving of false information for a citation or arrest on a warrant). The officers in this case, like those in *Rodgers/Kirkeby*, subjected defendant to an investigation for outstanding warrants, and defendant reasonably believed that she was required to cooperate with that investigation. When those same officers continued their criminal inquiry without telling defendant that she was free to go, defendant had no way to know that her cooperation was not required and she was seized.

When the majority declares, instead, that a reasonable person in defendant's circumstances would not believe that the police had restrained her liberty, 349 Or at 317-18, it ignores not only the legal authority that the police exhibited, but also social science research that demonstrates that people subjected to such authority believe that they are required to cooperate with the police and are not free to leave when subjected to questioning.

"[T]he available evidence suggests most people perceive an investigative encounter to be a seizure." Daniel J. Steinbock, *The Wrong Line Between Freedom and Restraint: The Unreality, Obscurity, and Incivility of the Fourth Amendment Consensual Encounter Doctrine*, 38 San Diego L Rev 507, 556-57 (2001). Empirical studies have shown that several features unique to police-citizen encounters undermine the idea that such encounters are consensual. *See* Janice

Nadler, *No Need to Shout: Bus Sweeps and the Psychology of Coercion*, 2002 Sup Ct Rev 153, 173 (2002) (features include whether investigator is a legitimately constituted authority). Those studies show that an officer's status as an authority figure leads citizens to believe that their cooperation is required, not requested:

> "[T]he listener is likely to conclude that an utterance is in fact a directive, or an order to be followed. For example, citizens generally do not interpret 'Can I please see your license and registration?' as spoken by a police officer as a genuine request; it is a command, and everyone understands this. * * * Importantly, authority figures do not need to employ highly face-threatening language to achieve their goal."

Nadler, 2002 Sup Ct Rev at 188 (citing Thomas Holtgraves, *Communication in Context: Effects of Speaker Status on the Comprehension of Indirect Requests*, 20 J Exp Psychol: Learning, Memory, & Cognition 1205 (1994)). In a survey of 54 citizens involved in vehicle searches, 49 of whom consented to the search, 47 responded that they were afraid of what might happen should they refuse.

> "Their fears included having their trip unduly delayed, being searched anyway, incurring property damage to their car if they refused and police searched anyway, being arrested, being beaten, or being killed. * * *.

> "* * * * *

> "When asked if they felt the police would have honored their request if they had refused, only one citizen answered 'yes,' and one did not know. All of the remaining respondents (96%) felt that police would not have honored their refusal and would have searched them anyway. Their concerns were apparently well founded: of the five motorists who declined to consent to the search, two reported being searched despite their explicit refusal to consent. Another motorist who refused to consent was not searched but was threatened with future retaliation."

Nadler, 2002 Sup Ct Rev at 202-03 (citing Illya D. Lichtenberg, *Voluntary Consent or Obedience to Authority: An Inquiry Into the "Consensual" Police-Citizen Encounter* (1999) (unpublished Ph.D. dissertation, Rutger's University)).

By citing those studies, I do not suggest that this court determine the meaning of the constitutional term "seizure" by engaging in a normative inquiry. What I do suggest is that, in giving effect to that term, this court use a mode of analysis that allows for the fact that our society is not homogenous and that, although some reasonable people may conclude that they are free to walk away from an officer who questions them, others, just as reasonably, may conclude otherwise. The analysis that the court announced in *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991), and applied in *State v. Toevs*, 327 Or 525, 535, 964 P2d 1007 (1998), *State v. Juarez-Godinez*, 326 Or 1, 6, 942, P2d 772 (1997), *State v. Dahl*, 323 Or 199, 207-08, 915 P2d 979 (1996), and *State v. Ehly*, 317 Or 66, 78-79, 854 P2d 421 (1993), was designed to do just that.

That analysis allows a court to ascertain, as it often does in other contexts, the belief or conclusion that a particular citizen had or reached, but to refrain from giving effect to that belief or conclusion if it does not fall within the range of reasonableness. *See, e.g.*, *T. R. v. Boy Scouts of America*, 344 Or 282, 181 P3d 758 (2008) (factfinder determines whether plaintiff knew that defendant had a role in causing injury; court determines whether that conclusion objectively reasonable); *Delgado v. Souders*, 334 Or 122, 137, 46 P3d 729 (2002) (factfinder determines whether plaintiff was alarmed and had reasonable apprehension regarding personal safety; court determines whether belief objectively reasonable); *State v. Villagran*, 294 Or 404, 408, 657 P2d 1223 (1983) (magistrate decides that probable cause to believe search would discover items specified in affidavit and court reviews whether neutral and detached magistrate reasonably could reach that conclusion); *State v. Krummacher*, 269 Or 125, 137-38, 523 P2d 1009 (1974) (court may not agree with jury's conclusion but must affirm if within realm of reasonableness).

The sole reason that the majority gives for abandoning that *Holmes* analysis is that "this court has seemed disinclined" to use it. 349 Or at 314. Although the majority does not assert that the *Holmes* formulation was unworkable or caused difficulty for the police, I note that that formulation permits the police to subject citizens to criminal inquiry as

long as they have reasonable suspicion that the citizens are engaging in criminal activity, and to do so, even without reasonable suspicion, if they directly inform the citizens (and do not engage in contradictory action).

In evaluating whether a person who is confronted by a police officer is seized, a trial court should not engage in the task of deciding whether a hypothetical person with unidentified characteristics and experiences would or would not feel free to leave; it should determine whether, as a matter of fact, the particular defendant believed that she was free to leave, and then, as a matter of law, whether the defendant's belief was within the range of reasonable beliefs. That mode of analysis is well-known to the trial courts and accommodates the diversity of our citizenry.[2]

In deciding that the only reasonable belief that the defendant in this case could have had was that she was free to walk away from the officers who questioned her, this court ignored not only defendant's personal reaction to the situation that she faced, but also the expectations that the law imposed on her and on all citizens who are subjected to police encounters. Even if there were good reasons for the majority to preclude consideration of the former, the majority erred in failing to consider the effect of the latter on the issue of objective reasonableness.

ORS 131.615 permits police officers to stop citizens and request their consent to search, but only when the officers have reasonable suspicion of criminal activity. ORS 162.247, ORS 162.385, and ORS 811.535 require citizens to obey police orders and provide police officers with accurate information. When a uniformed officer approaches a citizen and conducts a criminal inquiry, it is therefore reasonable for

---

[2] The *Holmes* formulation also benefits the state in that it would permit a court to consider, in deciding whether a citizen was seized, the citizen's acknowledgment that she believed that she *was* free to leave, and, if that belief is reasonable, to conclude that the citizen was not seized even if a hypothetical reasonable person would, in the majority's view, have believed to the contrary. *See State v. Salvador,* 237 Or App 424, 431-32 (2010) (Court of Appeals decided that defendant was not seized in part based on his concession "that he felt '100 percent' free to leave the scene.") *See also State v. Ford,* 310 Or 623, 642-43, 801 P2d 754 (1990) (Carson, C. J., specially concurring) (explaining that test of when "knock and announce" requirements will be excused should have subjective component to ensure that apprehension actually exists).

the citizen to understand that the officer has the required justification and, thereby, authority to detain the citizen, and it is legally reasonable for the citizen to act accordingly. If an officer approaches a citizen and conducts a criminal inquiry without reasonable suspicion, the citizen does not have any way to know that that suspicion is lacking or that the officer has made an unjustified request that can be ignored. If a citizen refuses to cooperate and is incorrect in doing so, the encounter may escalate and the citizen may violate the law. The law does not encourage a citizen to challenge police authority; it expects the citizen to recognize that authority and behave in accordance. When the citizen remains and submits to police investigation, believing that he or she must do so, he or she acts reasonably.

Although the Oregon legislature may require the citizens of this state to cooperate with legitimate governmental inquiries, those citizens have a concomitant constitutional right to expect that the government will respect their privacy and not subject them to unreasonable scrutiny. *See State v. Tanner*, 304 Or 312, 321-22 n 7, 745 P2d 757 (1987) (rights under Article I, section 9, defined by privacy one has a right to expect from government). The rights against unreasonable search and seizure that Article I, section 9, guarantees are rights that are held in common by all "the people" of this state—those who drive its roads, certainly, but also those who sit in its parks and walk its sidewalks as they live their daily lives. When this court permits the police to approach any one person and, without reasonable suspicion of criminal activity, request her identification and conduct a criminal inquiry, it interferes with the rights of all people to be free of unwarranted official scrutiny. I respectfully dissent.