Argued and submitted March 30, affirmed August 31, 2011

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL ROY JONES,
*Defendant-Appellant.*

Marion County Circuit Court
08C43905; A140767

263 P3d 344

Stephanie J. Hortsch, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Defendant appeals from a judgment of conviction for delivery of methamphetamine. He argues that the police officer's questioning that led to the discovery of the drugs was the result of an illegal stop and, for that reason, the trial court erred in denying his motion to suppress. We are therefore called on to determine, first, when the interaction between the arresting officer and defendant became a constitutionally significant seizure and whether, at that point, the police officer had reasonable suspicion of criminal activity. We affirm.

The facts are not disputed; the only issue before us is whether the trial court "applied legal principles correctly to those facts." *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). At 11:05 p.m., Salem Police Officer Parise was patrolling the parking lot of a Salem restaurant known for drug activity. Parise saw defendant behind the wheel of a car that was legally parked in front of the restaurant's bar. The car's lights were off. Parise wanted "to see what [defendant] was doing." He parked his patrol vehicle behind defendant's in such a way as to avoid blocking it. He did not activate his emergency lights, but he did turn on his spotlight and shine it into defendant's car. Parise also used his flashlight while approaching defendant.

As Parise approached, he saw that defendant was talking on his cell phone. Defendant once or twice looked back at Parise as he approached but otherwise ignored him. Parise knocked on defendant's car window. Defendant was hesitant to respond to the initial knock, but eventually he opened the door. Parise then asked defendant if he might hang up and talk to him, but "didn't * * * force him or direct [defendant] to hang up the phone." Eventually, defendant agreed to talk with the officer.

Defendant told Parise that he had just driven to the restaurant and was about to go inside. Parise immediately asked defendant if he was on parole or probation. Defendant responded that he was on parole. At that point, Parise developed the suspicion that defendant might be in the process of violating the conditions of his parole because, in Parise's

experience, people on probation and parole are often not allowed to enter establishments that serve alcohol.

Parise asked defendant for his identification. Instead of a driver's license, defendant handed Parise an Oregon State Penitentiary inmate identification card. Without moving away from his position next to defendant by the open car door, Parise radioed defendant's information to dispatch; dispatch confirmed that defendant was on parole, not allowed to enter bars or consume alcohol, and that his driver's license was suspended. Parise arrested defendant for driving while suspended, and a subsequent inventory search (not challenged at trial or on appeal) revealed the evidence that led to this drug charge.

Before trial, defendant moved to suppress the evidence on the ground that the officer seized him without reasonable suspicion. The trial court denied the motion, and defendant was tried on stipulated facts, reserving his right to appeal the court's decision. This is that appeal.

The underlying rule of law that governs this case is that a law enforcement officer violates a person's right under Article I, section 9, of the Oregon Constitution to be free from unreasonable seizure of his or her person if the officer stops the person without reasonable suspicion of criminal activity or arrests him or her—a more significant limitation on the person's freedom than a stop—without probable cause to believe that criminal activity is afoot.[1] *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991). We must therefore determine when defendant was stopped, as that term is defined in the case law, and whether, at that time, the officer had reasonable suspicion of criminal activity. We begin with the question of when defendant was stopped.

As we recently explained in *State v. Rutledge*, 243 Or App 603, 606, 260 P3d 532 (2011),

---

[1] On appeal, defendant also argues that the evidence must be suppressed because it derived from a violation of his rights under the Fourth Amendment to the United States Constitution. He did not make that argument before the trial court, so we decline to address it on appeal. *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000).

"The fundamental distinction between encounters between police and citizens that Oregon courts describe as 'mere conversation,' which have no constitutional significance, and those encounters [including 'stops'] that are seizures, which implicate Article I, section 9, of the Oregon Constitution, is that a seizure involves the imposition, by physical force or some show of authority, of some restraint on the individual's liberty. *State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010)."

In *Ashbaugh*, the Supreme Court held that a stop occurs

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred."

349 Or at 316 (emphasis omitted). The Supreme Court emphasized that the crucial question in determining if a mere encounter has become a stop is whether, by word or deed, a law enforcement officer has manifested a " 'show of authority' " that restricts a person's " 'freedom of movement.' " *Id.* at 317 (quoting *State v. Rodgers/Kirkeby*, 347 Or 610, 622, 227 P3d 695 (2010)).

Applying those principles, defendant contends that he was stopped when the officer, having shined his spotlight into defendant's car, knocked on his window, asked him to end his phone call and answer questions, and asked him if he was on probation or parole. In the alternative, defendant contends that he was stopped when the officer subsequently asked him for identification or, at the very latest, when the officer, having asked for and obtained defendant's identification, called it in to dispatch; at that time, defendant would reasonably have believed that he was "the investigatory subject of a pending warrant check" and therefore not free to leave. *State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005). The state acknowledges that this last event constituted a stop, but argues that the earlier events did not.

We disagree with defendant's primary contention. Perhaps since *Holmes*, but in any event at least since *Ashbaugh*, questions from a police officer to a citizen—even questions an ordinary citizen would regard as offensive, such

as, "Are you on probation?" or "May I search your purse?"—do not amount to a stop if the officer's words are conversational in tone and there is no accompanying nonverbal show of authority such as the presence of multiple officers, drawn weapons, or the like:

> "Although it is possible to restrict a person's liberty and freedom of movement by purely verbal means, * * * that is [not] what happened here [when the officer, having been told by the defendant that she was not carrying drugs, asked to search her purse]. Certainly, the content of [the officer's] questions did not cause defendant to be seized: As we repeatedly have observed, even though [the officer] asked defendant a question that one private citizen ordinarily would not ask another, [the] defendant does not point to anything about [the officer's] words that would be perceived as 'show of authority that restrict[ed] her freedom of movement.' "

*Ashbaugh*, 349 Or at 317 (internal citations omitted; emphasis omitted). In such situations, according to the Supreme Court, an ordinary, reasonable person would believe that he or she was free to ignore the questions and walk away. *Id.*[2] And although an officer effects a stop by asking a person for identification and then contacting dispatch to "run" the information, *Hall*, 339 Or at 19, or by asking and retaining identification for investigatory purposes, *State v. Harper*, 197 Or App 221, 235, 105 P3d 883 (2005), merely asking for identification, in the absence of other circumstances manifesting a show of authority, does not amount to a stop. *Id.*; *State v. Gilmore*, 123 Or App 594, 597, 860 P2d 882, *rev den*, 318 Or 171 (1993); *State v. Underhill*, 120 Or App 584, 588-89, 853 P2d 847, *rev den*, 318 Or 26 (1993).[3] We therefore conclude that defendant was not stopped until, after handing his identification to the officer, he heard the officer radio dispatch for information.

---

[2] As Judge De Muniz observed when he was on this court, "Although most people do not feel free to walk around an officer or ignore an officer's questions, under *Holmes* those feelings do not appear to be relevant in determining whether an objectively reasonable person believes that his or her freedom of movement has been significantly restricted." *State v. Underhill*, 120 Or App 584, 588 n 2, 853 P2d 847, *rev den*, 318 Or 26 (1993). In other words, the "reasonable person" who feels free to ignore a police officer's questions and walk away is a legal fiction.

[3] *See* n 2 above.

The outcome of this case, then, depends on whether, at that time, the officer had reasonable suspicion. To satisfy the reasonable suspicion requirement, an officer must subjectively believe that the suspected person has "a connection with criminal activity," and that belief must be objectively reasonable. *State v. Cloman,* 254 Or 1, 6, 456 P2d 67 (1969); *see Hall,* 339 Or at 16 n 10 (explaining that Article I, section 9, standard, "connection with criminal activity," is broader than statutory definition, "has committed a crime"). Here, Parise testified that, as soon as defendant told him that he was on parole and that he was about to enter the bar that he was parked in front of, Parise developed a suspicion that defendant was in the process of violating a condition of parole. "I immediately recognized—it's been my experience those who are on probation or parole while frequenting a place or an establishment, a bar, things of that nature, oftentimes may be [in] violation of their parole or probation." Defendant maintains that the officer's belief was not objectively reasonable because a prohibition against frequenting places where alcohol is served is not a standard condition of post-prison supervision. *See* ORS 144.102(2).

We agree that the officer lacked reasonable suspicion that defendant was violating his parole or probation. It is true that "reasonable suspicion" is a relatively low barrier. "Certainty about the significance of particular facts is not required for a police officer to hold a reasonable belief that they indicate criminal conduct." *State v. Briggs,* 229 Or App 660, 666, 212 P3d 1276, *rev den,* 347 Or 446 (2009). However, in this case, the only basis for the officer's suspicion was his "experience," which taught him that persons on post-prison supervision are "oftentimes" not permitted to go to establishments where alcohol is consumed. As we have explained,

"The extent to which an officer must explain the basis of his or her 'training and experience' knowledge * * * varies from case to case across a broad spectrum. At one extreme is knowledge such as the fact that a person who stole property is likely to keep it at his or her home—knowledge that, in fact, need not be justified by *any* reference to training and experience. At the other end of the spectrum is knowledge such as, for example, the fact that anhydrous ammonia is a

precursor chemical used in the manufacture of metham-
phetamine and that a brass fitting that has been in contact
with that substance will turn blue. Knowledge at that end
of the spectrum * * * requires more of a foundation than the
bare assertion of training and experience."

*State v. Daniels*, 234 Or App 533, 542, 228 P3d 695, *rev den*,
349 Or 171 (2010) (emphasis in original; citations omitted).
The fact that persons on post-prison supervision may not be
allowed in places where alcohol is served is hardly "esoteric,
specialized, counter-intuitive, or scientific." *Id.* On the other
hand, it is not an intuitively obvious or commonly understood
fact that most people would recognize as logical—it is not, in
other words, as obvious as the fact that people who steal
property often keep it at their home. Indeed, from publicly
available sources, one would conclude that such a condition is
relatively rare. The legislature has established a list of con-
ditions of post-prison supervision that "may" be imposed, and
staying out of bars and taverns is not among them. ORS
144.102(2). That condition would be a "special condition" that
could be imposed only if "necessary because of the individual
circumstances of the person on post-prison supervision." ORS
144.102(3)(a). Further, the Board of Parole and Post-Prison
Supervision has promulgated a list of "General" and "Special"
conditions of post-prison supervision, and staying out of bars
and taverns is not listed. OAR 255-070-0001 and Exhibit J
(http: // www.oregon.gov / BOPPPS / docs / EXHIBIT_J.pdf
(accessed Aug 24, 2011)). We therefore cannot conclude that
the officer's experience supports reasonable suspicion with-
out *some* indication of the "experience" on which the fact is
based. The only information that we have is his testimony
that he had been a police officer for over 12 years. That is not
enough. We therefore reject the state's argument that
Parise's suspicion that defendant was about to violate a con-
dition of post-prison supervision was objectively reasonable.

Very shortly thereafter, however, the situation
changed. In response to a request for identification, defen-
dant handed the officer an Oregon State Penitentiary inmate
identification card. At that point, defendant was behind the
wheel of an automobile, albeit a parked one. Parise knew that
defendant had driven to the parking lot where he was

located. Parise could reasonably have inferred that, if defendant had possessed a valid driver license, he would have given him that document instead of an inmate identification card. *See, e.g., State v. Cohan*, 227 Or App 63, 71, 204 P3d 816 (2009), *rev den*, 349 Or 664 (2011) (officer could reasonably suspect the defendant of driving without a valid license when, in response to request for identification, the defendant produced an Oregon Identification Card). In such circumstances, Parise's suspicion became reasonable. The fact that he did not articulate that reason for his suspicion is not relevant; "Article I, section 9, requires only that law enforcement officers reasonably believe that their conduct is justified, not that they be able to articulate a correct justification on which they actually relied." *State v. Brown*, 229 Or App 294, 303, 211 P3d 315 (2009) (citing *State v. Miller*, 345 Or 176, 186-88, 191 P3d 651 (2008)).

Thus, the officer had reasonable suspicion in this case when defendant handed him the inmate identification card. The stop occurred an instant or two later, when defendant heard Parise contact dispatch. Because the stop occurred after the development of reasonable suspicion, it was not unlawful, and the court did not err in denying defendant's motion to suppress.

Affirmed.