Argued and submitted June 27, reversed and remanded December 19, 2012

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DEBRA FRANCIS THOMPSON,
*Defendant-Appellant.*

Washington County Circuit Court
C100064CR; A145643

293 P3d 1082

Kali Montague, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

After the trial court denied defendant's motion to suppress evidence—drugs that a police officer found in defendant's purse and incriminating statements that she made thereafter—defendant was convicted of possession of methamphetamine. ORS 475.894. On appeal, she argues that, although she consented to the search that led to the discovery of the drugs and the subsequent statements, the consent occurred during an unlawful stop. The state maintains that the consent occurred during an encounter that was not a stop, but mere conversation and, for that reason, the encounter did not violate defendant's right to be free from unlawful seizure. We agree with defendant. We therefore reverse and remand.

The facts were adduced at a brief motion to suppress hearing, and they are not disputed. After what defendant described as a stressful day, she was visiting a friend, L. While she was sitting on a couch in L's apartment, three members of the Washington County Sheriff's Department, in plain clothes but displaying badges, arrived. They suspected that L was involved in theft and drugs, and they wanted to conduct a so-called "knock and talk," that is, a consensual interview at the suspect's residence. While two of the officers interviewed L inside her apartment, a third, Monk, asked defendant to step outside. Believing that she had no right to refuse—"He's an officer, he had a badge and he was asking me to do something. So I just figured that I should do it"—defendant complied. Monk assumed a position in the apartment doorway facing outward so as not to block defendant if she wanted to walk away. He asked defendant for identification, which she provided. He wrote down her name and date of birth, and then may or may not have returned the identification to defendant; he testified at the hearing that he could not remember, and the only other witness—defendant—was not questioned about that fact.

Monk then told defendant that he and the other officers were at the apartment on a drug-related investigation, and he asked defendant what she was doing there. She replied that she was visiting. Monk then asked her if she used drugs, and, when defendant said that she did

not, he asked if she had any drugs or weapons in her purse. She said that she did not. Monk then asked if he could search her purse. He did not tell her that she had a right to refuse the request. Without orally responding, defendant opened the purse and showed Monk its contents. He then asked if he could look in it himself, and she replied that he could. When he did, he saw a small pink coin purse that he suspected contained drugs. He opened it, and saw what he believed to be methamphetamine.[1] When he asked defendant where she had obtained it, she said she "got it from some guy in a bar," but, when pressed, she said that she had obtained it from L. Monk subsequently asked one of his partners to contact "dispatch" and "run" defendant's information. The record does not disclose what, if anything, he learned. At no time during the encounter did defendant ask to leave or attempt to leave, nor did Monk inform her that she could do so, although he testified that, had she made that request, he would not have objected and, had she walked away, he would not have pursued her. He also testified that, when he asked for consent to search her purse, he did not suspect her of criminal activity. The court expressly found Monk's testimony to be credible.

At the motion to suppress hearing, defendant argued that she was stopped when the officer asked her to come outside, obtained her identification, and wrote down her name and date of birth. Alternatively, defendant also argued that, if the stop did not occur at that point, it certainly occurred when Monk also told defendant that the officers were in L's apartment on a drug investigation, asked defendant if she was a drug user, and asked defendant if she had any drugs or weapons in her purse. The state responded that the encounter was low-key and conversational, there was no show of force, there was no physical restraint of defendant's freedom of movement, and that a reasonable person in defendant's position would (unlike defendant) have believed that she was free to leave. The court agreed with the state and denied defendant's motion to suppress. Subsequently, defendant stipulated to the of the charged

---

[1] Although defendant challenges the search of her purse, she does not separately challenge the opening of the smaller, closed coin purse that contained the methamphetamine.

offense, possession of methamphetamine. She was convicted and sentenced to 18 months of probation. She now appeals.

A warrantless seizure in the absence of reasonable individualized suspicion is unlawful. *State v. Holmes*, 311 Or 400, 410-11, 813 P2d 28 (1991), *abrogated in part on other grounds by State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010). Evidence that is the "fruit" of that "poisonous tree" must be suppressed. *State v. Hall*, 339 Or 7, 21, 115 P3d 908 (2005). The state concedes that Monk did not have reasonable suspicion that defendant had engaged or was engaging in criminal activity when he asked for consent to search her purse and that the discovery of the disputed evidence derived directly and proximately from that request. We agree. Therefore, if Monk's request occurred while defendant was "seized" for purposes of Article I, section 9, of the Oregon Constitution, the evidence must be suppressed.

> "A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred."

*Ashbaugh*, 349 Or at 316 (emphasis in original; footnote omitted). "The thing that distinguishes 'seizures' * * * from encounters that are 'mere conversation' is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *Id.* at 309. Whether a seizure has occurred is "a fact-specific inquiry into the totality of the circumstances of the particular case." *Holmes*, 311 Or at 408. Defendant maintains that a reasonable person in her situation would have believed that her freedom of movement had been impaired by a show of authority—that, in essence, a person in such circumstances would not feel free to leave. The state disagrees. The parties focus on the fact that, at the time of the request, Monk had asked for and obtained defendant's identification card and written down her name and date of birth.

The Supreme Court and this court have on several occasions dealt with cases revolving around the taking of

a suspect's identification, and several principles may be inferred from them. "[M]erely asking for identification, in the absence of other circumstances manifesting a show of authority, does not amount to a stop[,]" at least when the person who is subject to the request is the driver of an automobile. *State v. Jones*, 245 Or App 186, 191, 263 P3d 344 (2011). However, if the officer takes a person's identification card, the person is stopped until the card is returned. *State v. Painter*, 296 Or 422, 425, 676 P2d 309 (1984). That is so because "that action had the practical effect of making the defendant unable to leave." *Hall*, 339 Or at 19. Further, if the officer takes the person's identification card and then radios the information that it contains to "dispatch," the person is stopped, because the person at that point has reason to believe that he or she has become the object of a law enforcement investigation, at least until the person is informed that the "warrant check" revealed no inculpatory information. *Id.*; *State v. Lay*, 242 Or App 38, 40, 44-45, 252 P3d 850 (2011). Beyond these precepts, however, the cases reveal only that taking a person's identification and writing it down, as occurred here, is one factor to consider when determining whether, under the totality of the circumstances, a reasonable person would believe that her liberty had been restrained. In *Ashbaugh*, 349 Or at 317, for example, the court noted that "it may have been true" that the defendant was stopped after officers had taken her identification and she "had watched a clear show of authority directed at her husband," but she was *not* stopped after the identification was returned, a significant amount of time had , and officers had treated her in a relaxed and nonconfrontational manner. *See also State v. Wright*, 244 Or App 586, 592, 260 P3d 755 (2011) (invoking "totality of the circumstances"; distinguishing *Ashbaugh*).

On appeal, defendant argues that taking her identification and writing down her information, in combination with other circumstances, amounted to what a reasonable person would regard as a significant restraint on her liberty. We agree. Although, as the state maintains, the facts here resemble those in *Ashbaugh*, there are significant and, we believe, dispositive differences. In both cases, it is true, police officers, in the context of what had obviously

been an exercise of their law enforcement authority, approached a person about whom they had no reasonable suspicion of criminal conduct, inquired whether the person had anything illegal in her purse and, when she denied that she did, asked for consent to search. *Ashbaugh*, 349 Or at 301-02. In both cases, the officers were not threatening or coercive. *Id.* at 317.

In the present case, however, there was no significant break in time between Monk's request for, and recording of, defendant's identification and his questioning, whereas in *Ashbaugh*, the officers had taken the defendant's identification, run a warrant check, and returned the card to her; the defendant could, therefore, presume that she was no longer, at that point, the subject of an investigation. *Id.* at 300-01. Further, although the officers in *Ashbaugh* approached the defendant, in the present case, Monk asked defendant to change her location. The situation here more closely resembles *State v. Radtke*, 242 Or App 234, 255 P3d 543 (2011). In that case, the defendant approached by bicycle an ongoing interview between a police officer and the defendant's friend, who was in the back of a patrol car. *Id.* at 236-37. The officer asked the defendant if he could talk to her and motioned for her to approach him. *Id.* at 237. Believing that he did not have enough suspicion to effect a stop, he nonetheless asked the defendant for her identification and took down her name and date of birth. *Id.* "He then asked [the] defendant if she had any drugs, weapons, [or] anything illegal on her. When [the] defendant said that she did not, [the officer] asked if he could check her person and pockets for any drugs." *Id.* at 237 (quoting *State v. Radtke*, 230 Or App 686, 688-89, 217 P3d 220 (2009), *vac'd and rem'd*, 349 Or 663, 249 P3d 1281 (2011)) (second brackets in original; internal quotation marks omitted). We reasoned:

> "A reasonable inference from that sequence of events is that [the officer] took [the] defendant's name and date of birth for the purpose of running a check on her and the reason that he had not done so in no way indicated that he was not going to—in other words, that the investigatory process had commenced and was ongoing up to the point of arrest. That inference is bolstered by several other circumstances. First, [the] defendant observed that the

person whom she was planning to meet was under arrest, in the 'caged' back seat of a patrol car. Second, there were two officers present and both were armed and in uniform. Third, as noted, in addition to taking her information, [the officer] also questioned [the] defendant about illegal activity, albeit in a calm and nonconfrontational voice."

*Id.* at 240. We held that, under the totality of the circumstances, the defendant was stopped. *Id.* at 241. Similar reasoning applies here. As defendant was being questioned, her friend L was clearly under investigation for some drug-related offense. Three officers, in plain clothes but identified as officers by visible badges, were present, albeit not armed. And, like the officers in *Radtke*, Monk questioned defendant about illegal activity, "albeit in a calm and nonconfrontational voice."

Further, the questioning here was somewhat more intrusive than in *Ashbaugh*. There, the officers asked the defendant only if "she had anything illegal in her purse." *Id.* at 302 (internal quotation marks omitted). Here, in the *immediate* context of what defendant had been told was an *ongoing* drug investigation, Monk asked her to relocate and then asked if she, too, was a drug user; when she denied it, he then asked to search her purse. We cannot conclude that a reasonable person in these circumstances would believe that she was free to simply stop answering questions and depart. For that reason, we conclude that she was stopped without reasonable suspicion, and the evidence that concededly derived from that stop should have been suppressed.

Reversed and remanded.