Submitted on remand from the Oregon Supreme Court April 16, reversed and remanded August 13, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DEBRA FRANCIS THOMPSON,
*Defendant-Appellant.*

Washington County Circuit Court
C100064CR; A145643

333 P3d 1125

Peter Gartlan, Chief Defender, and Kali Montague, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Jeff J. Payne, Assistant Attorney

General, filed the brief for respondent. Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Jeff J. Payne, Assistant Attorney General, filed the supplemental brief.

Before Wollheim, Presiding Judge, and Nakamoto, Judge, and Schuman, Senior Judge.

SCHUMAN, S. J.

## SCHUMAN, S. J.

This case is before us for the second time. In our first opinion, *State v. Thompson*, 254 Or App 282, 293 P3d 1082 (2012), we held that the interaction between defendant and police officers was a seizure of her person and that it was not justified by reasonable suspicion, a warrant, or anything else. Consequently, we held that the trial court erred in denying her motion to suppress evidence that derived from that unlawful seizure. We reversed and remanded. The Supreme Court accepted the state's petition for review and held the case in abeyance pending that court's resolution of several cases involving the question of when a police officer's request for, and retention of, a citizen's identification amounted to a constitutionally significant seizure. After the court decided those cases—*State v. Backstrand*, 354 Or 392, 313 P3d 1084 (2013); *State v. Highley*, 354 Or 459, 313 P3d 1068 (2013); and *State v. Anderson*, 354 Or 440, 313 P3d 1113 (2013)—the court vacated our decision and remanded it to us for reconsideration. *State v. Thompson*, 354 Or 837, 325 P3d 738 (2014). On reconsideration, we adhere to our earlier decision, albeit for somewhat different reasons. We therefore reverse and remand.

The facts, as we related them in our first opinion, are as follows:

> "After what defendant described as a stressful day, she was visiting a friend, L. While she was sitting on a couch in L's apartment, three members of the Washington County Sheriff's Department, in plain clothes but displaying badges, arrived. They suspected that L was involved in theft and drugs, and they wanted to conduct a so-called 'knock and talk,' that is, a consensual interview at the suspect's residence. While two of the officers interviewed L inside her apartment, a third, Monk, asked defendant to step outside. Believing that she had no right to refuse— 'He's an officer, he had a badge and he was asking me to do something. So I just figured that I should do it'— defendant complied. Monk assumed a position in the apartment doorway facing outward so as not to block defendant if she wanted to walk away. He asked defendant for identification, which she provided. He wrote down her name and date of birth, and then may or may not have returned

the identification to defendant; he testified at the hearing that he could not remember, and the only other witness—defendant—was not questioned about that fact.

"Monk then told defendant that he and the other officers were at the apartment on a drug-related investigation, and he asked defendant what she was doing there. She replied that she was visiting. Monk then asked her if she used drugs, and, when defendant said that she did not, he asked if she had any drugs or weapons in her purse. She said that she did not. Monk then asked if he could search her purse. He did not tell her that she had a right to refuse the request. Without orally responding, defendant opened the purse and showed Monk its contents. He then asked if he could look in it himself, and she replied that he could. When he did, he saw a small pink coin purse that he suspected contained drugs. He opened it, and saw what he believed to be methamphetamine. When he asked defendant where she had obtained it, she said she 'got it from some guy in a bar,' but, when pressed, she said that she had obtained it from L. Monk subsequently asked one of his partners to contact 'dispatch' and 'run' defendant's information. The record does not disclose what, if anything, he learned. At no time during the encounter did defendant ask to leave or attempt to leave, nor did Monk inform her that she could do so, although he testified that, had she made that request, he would not have objected and, had she walked away, he would not have pursued her. He also testified that, when he asked for consent to search her purse, he did not suspect her of criminal activity. The court expressly found Monk's testimony to be credible."

254 Or App at 284-85 (footnote omitted).

To those facts, we applied what we understood at the time to be the principles that determined when an encounter between a law enforcement officer and a person was sufficiently intrusive so as to implicate the person's right to be free from unreasonable seizures—in other words, when the encounter ceased being mere conversation, and became instead a "stop" or an "arrest." *See State v. Holmes,* 311 Or 400, 410-11, 813 P2d 28 (1991), *abrogated on other grounds by State v. Ashbaugh,* 349 Or 297, 309, 244 P3d 360 (2010) (distinguishing between "mere conversation," which does not implicate Article I, section 9, concerns, from

stops and arrests, which do). Quoting from and summarizing *Ashbaugh*, 349 Or at 309, the most recent and definitive case on the subject at that time, we stated:

> "'A "seizure" of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred.'

> "*Ashbaugh*, 349 Or at 316 (emphasis in original; footnote omitted). 'The thing that distinguishes "seizures" * * * from encounters that are "mere conversation" is the imposition, either by physical force or through some "show of authority," of some restraint on the individual's liberty.' *Id.* at 309. * * * Defendant maintains that a reasonable person in her situation would have believed that her freedom of movement had been impaired by a show of authority—that, in essence, a person in such circumstances would not feel free to leave. The state disagrees. The parties focus on the fact that, at the time of the request, Monk had asked for and obtained defendant's identification card and written down her name and date of birth."

*Thompson*, 254 Or App at 286 (first ellipses in *Ashbaugh*; second added). We then recited that, according to our reading of Supreme Court opinions, there were two police actions that always amounted to a seizure: First, if the officer takes a person's identification card, the person is *per se* stopped until the card is returned, *State v. Painter*, 296 Or 422, 425, 676 P2d 309 (1984), because, while the officer has the person's card, the person's freedom to leave has been impaired, *State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005); and second, if the officer takes the person's identification information and radios it to "dispatch" or otherwise indicates to the person that the information will be used in a law enforcement investigation, the person is always stopped because a person who knows that he or she is in that situation would understand that he or she cannot simply leave the scene, *id.* "Beyond these precepts, however," we noted, "the cases reveal only that taking a person's identification and writing it down * * * is one factor to consider[.]" *Thompson*, 254 Or App at 287. We acknowledged that "[w]hether a seizure has occurred is

a 'fact-specific inquiry into the totality of the circumstances of the particular case.'" *Id.* at 286 (quoting *Holmes*, 311 Or at 408).

We also identified some of the other circumstances that factored into the "totality" determination: asking a person to change his or her location, questioning the person about his or her participation in unlawful activity, interviewing a person in the context of an ongoing drug investigation of another person, and asking a woman for consent to search her purse. *Id.* at 289. Applying these precepts, we concluded that defendant was seized for purposes of Article I, section 9.

*Backstrand, Highley,* and *Anderson* demonstrated that our survey of the Article I, section 9, landscape was erroneous in several respects. Most significantly, those cases repeatedly emphasized that neither briefly holding a person's identification card, nor calling in the person's identification information to check for warrants, necessarily and always meant that the person was stopped. *Backstrand,* 354 Or at 416 (officer does not stop a person when the officer takes the person's identification card and retains it for a reasonable time); *Highley,* 354 Or at 472 ("*Hall* should not be understood, as it appears to have been understood by some advocates and by the Court of Appeals, to stand for the proposition that an officer's request for identification and a check of that identification, either to determine its validity or the status of the person who tenders it, is a *per se* stop.").[1] Indeed, with one possible exception described below, the court in *Backstrand* held that determining whether an

---

[1] We probably misled ourselves on the basis of this language in *Hall*, 339 Or at 19 (emphasis added):

"[I]nitial actions [by Officer Deese] of stopping his vehicle next to defendant and then gesturing for defendant to approach him did not intrude upon defendant's liberty of movement. *** When Deese took defendant's identification card and radioed the police dispatch for a warrant check, however, the consensual nature of that encounter dissipated, and the encounter evolved from a 'mere conversation' encounter into a restraint upon defendant's liberty of movement. It is true that *** Deese promptly returned defendant's identification card. Nevertheless, when Deese did so, defendant was cognizant that Deese was investigating whether defendant was the subject of any outstanding warrants. *Although the state insists to the contrary, we find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check.*"

encounter is or is not a stop always requires a fact-specific inquiry, and that inquiry is guided by an overarching rule:

> "[P]olice requests for information or cooperation do not implicate Article I, section 9, as long as the officer does no more than seek the individual's cooperation through non-coercive questioning and conduct. A request for identification, in and of itself, is not a seizure. Nor is an officer's act of checking the validity of that identification, in and of itself, a seizure. For a request and verification of identification to amount to a seizure, something more is required on an officer's part. Either through the context, the content or manner of questioning, or the other circumstances of the encounter, the officer must convey to a reasonable person that the officer is exercising his or her authority to significantly restrain the citizen's liberty or freedom of movement."

*Backstrand,* 354 Or at 417.

The one possibly remaining *per se* rule is this: When an officer takes a person's identification card and retains it for *more than a reasonable time,* the encounter is a stop. Briefly retaining an identification card is not a "significant" restraint of a person's liberty or freedom of movement, but at several places, the court in *Backstrand* implies that an unreasonably extended retention is. The court notes that, generally, a seizure occurs when the police-citizen interaction "exceeds the bounds of ordinary social encounters between private citizens." 354 Or at 400. In ordinary encounters between, for example, a young-appearing would-be purchaser of alcohol and a seller, the seller's request for, and brief retention of, the purchaser's identification would not be considered coercive or extraordinarily unsocial. If the seller, on the other hand, takes the card and holds it for an amount of time far in excess of what is necessary to confirm that it is genuine—say, for 30 minutes—the purchaser's freedom of movement has been *significantly* impaired, and the seller's actions, even if the seller never raises his or her voice or imposes a concrete physical restraint, exceeds the bounds of ordinary social encounters. Put another way, the seller's actions have "implicitly" conveyed to the purchaser that he or she is not free to "go about his or her ordinary affairs." *Id.* at 402.

More significantly, the court appears to reaffirm what it perceives as the dispositive issue in *Painter*, 296 Or at 425, that is, an officer can briefly retain identification, but cannot extend that retention. In describing the police officer's conduct in *Backstrand*, the court explains,

"Gerba [the arresting officer] did not 'retain' defendant's license beyond a reasonable period for purposes of examining and verifying it, which was dispositive in *Painter*. Rather, Gerba held defendant's license for 10-15 seconds before returning it. We are hard-pressed to see how holding a person's license for no more than 15 seconds, pursuant to the person's voluntary production of that license, could result in a significant restriction of a person's liberty on that basis alone."

354 Or at 416 (emphasis omitted). The negative implication of this reasoning is that, if Gerba *had* retained the defendant's license beyond a reasonable period, that *would* have resulted in a significant restriction of Backstrand's liberty.

Whether retention of identification for a long period is a *per se* stop or, on the other hand, merely another factor to consider in gauging the totality of the circumstances, does not ultimately matter in this case. The state has the burden of justifying a warrantless seizure of evidence, and part of that burden is establishing that the seizure was not the fruit of an unlawful stop. ORS 133.693(4); *State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000). Here, the state failed to produce *any* evidence that the officer's retention of defendant's identification was brief; Officer Monk testified that he did not remember returning defendant's identification. That fact, even if it is only one fact among many, compels, in the context of other facts, the conclusion that defendant was stopped when Monk obtained her consent to search her purse. Monk's conversation occurred during an investigation taking place in an apartment where defendant was present. There were three officers present. Monk asked defendant to change her location. He asked her for identification and wrote down her name and date of birth. He told her that he and the other officers suspected that drug activity was occurring on the premises. He asked her why she was there, and he asked her if she was a drug user. As best we can discern, he did all of this while retaining her identification.

We have no difficulty concluding that, not only did his conduct exceed what might normally occur in social intercourse between ordinary citizens, but that it would also convey to any reasonable person that the officer was exercising his authority to implicitly but significantly restrain her liberty of movement.

Reversed and remanded.