DeVORE, P.J.
*424 *828 Defendant appeals from a judgment of conviction for delivery of methamphetamine, ORS 475.890(2). The trial court had denied his motion to suppress evidence obtained from defendant at the scene of a drug purchase arranged by a police informant. Defendant assigns error to the denial of the motion, arguing that an officer unlawfully extended a seizure of his person without reasonable suspicion as to him. He argues that an unlawful extension, together with an unlawful seizure from him of a knife, rendered inadmissible his subsequent disclosure of methamphetamine in his pocket. We conclude that detectives had reasonable suspicion that defendant was involved in a drug sale and that an unlawful seizure of his knife did not invalidate his disclosure of his possession of methamphetamine. We affirm.
When reviewing a denial of a motion to suppress, we are bound by the trial court's findings of fact that are supported by evidence in the record. State v. Stevens , 311 Or. 119, 126, 806 P.2d 92 (1991). If the trial court did not make findings on all facts and if there is evidence from which those facts could be decided more than one way, we will presume that the trial court found facts in a way consistent with its ultimate conclusion. Id . at 127, 806 P.2d 92 (citing Ball v. Gladden , 250 Or. 485, 487, 443 P.2d 621 (1968) ).
On February 5, 2013, detective Scriven assisted detective Hansen in a "controlled buy-bust" that was arranged with the help of a confidential informant. Their target was Collier, from whom the informant had planned to buy 1.7 to 1.8 grams of methamphetamine. The detectives expected that someone, in addition to Collier, might be present because Collier said he would get a ride from someone to the site of the sale. Shortly before the sale, the meeting site changed a couple of times. The parties eventually settled on a Bi-Mart parking lot. There, the detectives spotted a car with a woman in the driver's seat and defendant in the front passenger seat. They saw Collier emerge from the back seat of the car and pace around some distance from the car, while making cell phone calls to the informant. Hansen called Burge, a nearby detective, to intercept Collier. Scriven and *829 Hansen approached to talk to the driver and defendant in the car.
Based on his experience and training, Scriven believed it was common for multiple people to be present at drug transactions. He was not surprised that others accompanied Collier, because he knew that other persons either provide transportation or are the dealer from whom the drug seller gets the drugs. The person delivering the drugs may not possess the drugs. That is, the "main guy doesn't want to just give up the drugs until he has the money so he'll ride with [a 'middle-man'] so he doesn't get ripped off."
Hansen absolutely "expected" that defendant was involved in the drug transaction because he was present in the car. Hansen suspected that defendant might be involved, as he explained later:
"It's also common for individuals to be a middle man, what we refer to as a middle man, so a drug dealer won't let his drugs, you know, go out of his sight so sometimes a drug dealer will go with the person who is a middle man, and then also people weigh their drugs in cars and use their drugs in cars, things like that. That's why we were interested in the vehicle."
Hansen allowed that he was not "completely sure at the time," but he suspected that defendant's presence meant that Collier was a "middle-man." Explaining that the volume of methamphetamine had something to do with it, Hansen later testified:
"A. Well, obviously, drugs are expensive and we were buying 1.8 grams, so that's a good amount of money, so what the drug dealer, depending on their trust basis, the drug dealer will sometimes let their drugs walk but generally-
"Q. When you say 'walk,' what do you mean?
"A. Like they'll give them to somebody to take it to whoever else and then they *425 expect that person to bring the money back.
"Q. Okay.
"A. So they can get ripped off easily because the drugs go away and then the person doesn't necessarily have to *830 bring their money back, so that's a middle man. So the middle man person isn't necessarily holding on to the quantity of drugs that are being ordered, so they have to go to somebody that is holding that amount, which the person that's buying the drugs doesn't have that connection and so that middle man person, quote unquote, is the connection.
"Q. So under that theory, and we're not saying it necessarily even happened, under that theory you're saying Mr. Collier would be the middle man?
"A. Correct.
"Q. Collier makes the arrangement but Mr. Collier isn't someone who is trustworthy so another individual might accompany Mr. Collier to keep an eye on things?
"A. Correct.
"* * * * *
"Q. And you said you weren't totally sure but is that what you suspected in this case was you suspected the driver and the passenger?
"A. I suspected that they were absolutely involved because they were waiting in the parking lot. They changed their location that many times. It's pretty common with a drug dealer if he gets somebody to drive and they keep changing *** locations like that."
As Scriven approached the driver, Hansen approached defendant on the passenger side of the car. Hansen asked defendant to roll down his window. As the window started down, Hansen displayed his badge. Defendant rolled the window back up and moved his hands toward his waist. Concerned that defendant might have a weapon, Hansen opened the door and ordered defendant to get out of the car and show his hands-to show them free of weapons. At the hearing, Hansen explained that it was uncommon for people, when contacted by the police, to roll their window up and move their hands out of view. He said that people commonly carry weapons around their waist. Hansen did not want the driver or defendant to reach for weapons or destroy evidence. Hansen did a patdown of defendant's waist area and found no weapons.
Hansen asked Klopenstein, another officer, to stay with defendant while Hansen retrieved his cell phone from *831 his car. In Hansen's opinion, defendant was not free to leave. Looking back, Hansen saw defendant reach under his sweatshirt to his shirt pocket. At the hearing, Hansen described the behavior as "indexing." He explained that a person under stress, especially in situations involving drugs, will touch the pocket containing drugs or a weapon. Hansen returned to defendant and did another patdown, feeling a small bulge in defendant's shirt pocket. Defendant said the bulge was just coins in a coin purse. Hansen asked the driver and defendant for consent to search the car, but they refused consent.
Hansen stepped away again to speak with Collier, the original target of the investigation. Collier gave Hansen consent to search him, and Hansen found methamphetamine on Collier.
While Hansen was with Collier, Klopenstein saw a clip for a knife on defendant and took what he discovered was a knife.
Having found methamphetamine on Collier, Hansen returned to defendant and asked him if he would remove the items from his pocket. Defendant said that he did not have any drugs on him. Hansen told defendant and the driver that he had two options-either they consent to a search of the vehicle or he would call a K-9 unit. Hansen told them that, if the dog alerted to the vehicle, he would impound the vehicle and get a search warrant. As Hansen was calling the K-9 officer, defendant interrupted him and said that he would remove the items from his pocket. Defendant removed his items, including "a good amount of cash," but not the item in his shirt pocket. Defendant claimed, at first, that he had removed the coins, but, when Hansen did not believe defendant, defendant sighed and reached for his shirt pocket, admitting the item was drugs. Fearing that defendant might try to throw away evidence, Hansen *426 asked defendant to let Hansen remove the drugs, and defendant consented. Hansen found just under half an ounce of methamphetamine. Hansen advised defendant of his Miranda rights, and defendant said that the methamphetamine found in Collier's possession had come from defendant's supply. *832 Before the trial court, defendant urged that all evidence obtained from him had been obtained in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution and should, therefore, be suppressed. The trial court addressed the motion in the sequence that the facts presented. The trial court determined that defendant was stopped or seized when Hansen ordered him out of the car and conducted a patdown of his waist, but the court concluded that the seizure was justified by officer safety concerns because defendant rolled up his window and made furtive motions toward his waist. The trial court determined that the detectives had reasonable suspicion thereafter to extend the stop to question defendant based on their suspicion that defendant was involved in the intended drug purchase. The court determined that suspicion was reasonable due to defendant's presence in the car, the changes of location, and the detectives' experience that drug dealers commonly employ a middle-man, like Collier, to avoid loss of drugs and nonpayment. Finally, the trial court concluded that defendant's actions were consensual when he emptied his pockets and admitted possessing methamphetamine. The court denied the motion.
On appeal, defendant concedes that the initial seizure-ordering him out of the car-and the patdown were justified by an officer safety concern.[1] But defendant argues, first, that the stop was unlawfully extended after that patdown revealed no weapons. In his view, the officer did not have reasonable suspicion to justify extending the stop further as to him. Defendant argues that reasonable suspicion must be individualized and cannot be based on his mere presence with someone else with drugs. Next, he argues that an unlawful extension of the stop, coupled with an unlawful seizure of the knife, render invalid his statements and his disclosure of the contents of his shirt pocket.
The state responds that the extension of the stop as to defendant was justified by the several circumstances cited by the trial court. The state concedes that, because no one explained the seizure of the knife at the hearing, that *833 seizure must be treated as unlawful. The state contends, however, that defendant's subsequent statements and disclosures were not caused or otherwise tainted by the seizure of the knife. For the reasons that follow, we agree with the state.
We address first defendant's contention that the detectives lacked reasonable suspicion, specific to defendant, to extend the stop after the initial seizure. Generally, a police officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person to make a reasonable inquiry. State v. Watson , 353 Or. 768, 774, 305 P.3d 94 (2013) ; ORS 131.615(1). A police officer "reasonably suspects" criminal conduct when the officer " 'holds a belief that is reasonable under the totality of the circumstances.' " State v. Holdorf , 355 Or. 812, 817, 333 P.3d 982 (2014) (quoting ORS 131.605(6) ).[2] The Oregon Supreme Court has observed:
"The people have a liberty interest to be free from unreasonable searches and seizures that is protected by provisions of the Oregon and federal constitutions. The standard of 'reasonable suspicion' justifying a police intrusion on that liberty interest when a person is stopped was intended to be less than the standard of probable cause to arrest. A stop is unlawful unless it meets an objective test of reasonableness based on observable facts. Officer intuition and experience alone are not sufficient to *427 meet that objective test. However, if an officer is able to point to specific and articulable facts that a person has committed a crime or is about to commit a crime, the officer has a 'reasonable suspicion' and may stop the person to investigate."
Holdorf , 355 Or. at 822-23, 333 P.3d 982. When considering the "totality of the circumstances" known to an officer, we recognize the "collective knowledge doctrine," allowing the officer's reasonable reliance on information from other officers. Those circumstances also include relevant information about other persons with whom defendant is stopped. Id . at 825, 333 P.3d 982 *834 (including shared knowledge about defendant's companion); see also State v. Westcott , 282 Or. App. 614, 619-20, 385 P.3d 1268 (2016), rev. den. , 361 Or. 486, 395 P.3d 873 (2017) (companion can be considered in totality of circumstances).
Defendant dismisses the significance of the detectives' testimony that, under the circumstances seen, they suspected defendant to be a supplier for Collier who served in a "middle-man" arrangement. Having dismissed that testimony, defendant then asserts that the facts reduce to (1) defendant was a mere passenger in a car with someone likely to deliver drugs and (2) defendant merely rolled up his window, asserting his constitutional right to ignore the detective. Simplifying this case in that way, defendant contends that this case should follow our decision in State v. Kingsmith , 256 Or. App. 762, 302 P.3d 471 (2013). We are not persuaded.
First, the detectives' testimony cannot be so lightly dismissed. It is true that Hansen testified that he "wasn't completely sure at the time" that defendant was involved in a middle-man arrangement to sell drugs. In Westcott , however, we observed, "Reasonable suspicion is a 'relatively low barrier,' less demanding than probable cause; it does not require '[c]ertainty about the significance of particular facts.' " 282 Or. App. at 618, 385 P.3d 1268 (quoting State v. Jones , 245 Or. App. 186, 192, 263 P.3d 344 (2011), rev. den., 354 Or. 838, 325 P.3d 739 (2014) ); see also State v. Hammonds/Deshler , 155 Or. App. 622, 627, 964 P.2d 1094 (1998) ("Reasonable suspicion does not require that the articulable facts as observed by the officer conclusively indicate illegal activity but, rather, only that those facts support the reasonable inference that a person has committed a crime.") (emphasis in original).
Here, Hansen's testimony is evidence on which the trial court could rely in support of its denial of defendant's motion to suppress. Hansen explained that it was common for a drug source to use a third-party for the exchange and to accompany the third-party to assure payment and avoid loss of the drugs. Because a "good amount" of money was involved and because the location of the transaction had changed a couple of times, Hansen absolutely suspected that defendant was involved in the transaction. When offering such *835 testimony, Hansen drew upon his experience and training as a detective while making reference to "specific and articulable facts" of the circumstances at hand. Such facts, made significant in light of an officer's training and experience, are considered in the calculus of reasonable suspicion. See Holdorf , 355 Or. at 827-29, 333 P.3d 982 (officer's training and experience may be given appropriate weight, revealing a defendant's nervous behavior as indicative of being under influence of methamphetamine). As a result, the circumstances here do not reduce to defendant as a mere passenger and nothing more.
Second, defendant's act of rolling up his window-arguably to assert a constitutional right-is not necessary to the calculus of reasonable suspicion here. It is certainly true that we have observed that, when a defendant refused to give an officer consent to search her purse, a "person's assertion of a constitutional right cannot support a reasonable suspicion of criminal activity." State v. Rutledge , 243 Or. App. 603, 610, 260 P.3d 532 (2011). It is also true that a "defendant's avoidance of a police investigation that [the defendant] apparently concluded was directed at [the defendant]" may contribute to an officer's reasonable suspicion to stop the defendant. State v. Goss , 219 Or. App. 645, 652, 184 P.3d 1155, rev. den. , 345 Or. 94, 189 P.3d 749 (2008) (defendant attempted to walk away from officer investigating report of intoxicated driver).
*428 Here, defendant's initial acts-rolling up the window and furtive movements with his hands-were not critical to Hansen or to the trial court when explaining reasonable suspicion. We agree that defendant's initial actions-regardless how they are characterized-are not necessary to a determination of reasonable suspicion.
Third, we do not draw from our decision in Kingsmith the lesson that defendant urges. That is, we do not agree that, in every case, to be a passenger in a car can only be a matter of "mere association" or "generalized suspicion," which may be the kind of circumstance that cannot contribute to individualized, reasonable suspicion. To draw that lesson from Kingsmith is to exaggerate the case and to ignore a more recent decision from the Supreme Court.
*836 Kingsmith began as a traffic matter. One evening, state troopers were conducting speed enforcement on an interstate highway. They saw two cars meet on a dead-end road, and a person briefly exit a car and return. Suspicious that somebody would meet at such a remote location unless for a drug transaction, the troopers stopped one of the cars for traffic infractions. They smelled a faint odor of marijuana emanating from the car. The driver was cited for lack of vehicle registration. The defendant was a backseat passenger of whom the officers took no notice. The driver was nervous and had methamphetamine sores; a front seat passenger fidgeted. The troopers held the car until a K-9 unit arrived to do a dog-sniff search. When the dog alerted, troopers found the defendant's purse inside the car with methamphetamine pipes. 256 Or. App. at 764-66, 302 P.3d 471. Defendant was charged with unlawful possession of methamphetamine, ORS 475.894. The trial court denied, in part, defendant's motion to suppress.
The state conceded that the defendant was seized when the car in which she was a passenger was stopped. But see State v. Amaya , 336 Or. 616, 630, 89 P.3d 1163 (2004) (passengers in a "stopped" car, who are not the subject of investigation, are not necessarily themselves seized under Article I, section 9, of the Oregon Constitution ). Proceeding on that unchallenged premise, the question became whether the troopers had had reasonable suspicion that defendant, someone in the back seat with whom the troopers were not involved, had committed a crime. The issue reduced "to the significance of defendant's presence" in a car at the time the two cars met in what might have been, but was not known to be, a drug purchase.
We relied on our opinion in State v. Holdorf , 250 Or. App. 509, 280 P.3d 404 (2012), reversed , 355 Or. 812, 333 P.3d 982 (2014), in which we concluded that the proximity of the defendant's companion, who was involved in drugs, did not create reasonable suspicion of the defendant's involvement in criminal activity. Therefore, in Kingsmith , we stressed the need for reasonable suspicion as to the defendant herself without regard for her companions. Kingsmith , 256 Or. App. at 771-72, 302 P.3d 471 (citing Holdorf , 250 Or. App. at 514-15, 280 P.3d 404 ). With *837 no indication that the two-car rendezvous was actually a drug sale and with nothing incriminating the defendant, we concluded the trial court erred in denying the defendant's motion to suppress. Id . at 773, 302 P.3d 471.
In the following year, the Supreme Court reversed our opinion in Holdorf , 355 Or. 812, 333 P.3d 982. In that case, one officer recognized Watts, the driver of an SUV, as a suspect in a methamphetamine distribution ring. The defendant, a passenger, was unknown to police. Another officer, Salang, upon hearing that background on Watts, stopped the SUV for a traffic infraction. The officer, based on his training and experience, recognized the defendant's nervousness and fidgeting behavior as "tweaking" under the influence of methamphetamine. Salang held the defendant at the scene, conducted a patdown search and found methamphetamine and marijuana in his pockets. The trial court denied the defendant's motion to suppress the evidence.
In our opinion, we had disregarded the suspicion that the driver Watts was involved in a drug distribution ring, and we had concluded that the defendant's fidgety demeanor was insufficient to provide reasonable suspicion of drug possession. The Supreme Court, however, concluded that Salang could rely on the information from the first officer about *429 the driver Watts and that Watts's suspected involvement in a drug distribution ring, together with the defendant's behavior at the scene, could be considered in the totality of the circumstances. The court held that those circumstances provided a reasonable inference that the defendant committed the crime of possession of methamphetamine. Id. at 829-30, 333 P.3d 982.
After the Supreme Court's decision, we conclude that Holdorf provides better guidance than Kingsmith . When applied to the facts of this case, Holdorf leads to the conclusion that Hansen had reasonable suspicion that defendant was involved in the planned drug transaction and, therefore, had justification to extend the seizure of defendant to inquire further about his involvement in the transaction. Like the trial court, we reach that conclusion based on the totality of the circumstances.
*838 Among them, the trial court may credit the detectives' training and experience. Holdorf , 355 Or. at 828-29, 333 P.3d 982. Their training and experience caused them to recognize that defendant's presence could well mean that the investigative target Collier was merely a "middle man" for defendant as the dealer and source of the methamphetamine to be sold. Whoever had accompanied Collier, as the car made multiple changes in the location of the meeting, was likely someone who knew that the purpose was a drug transaction and was not an acquaintance catching a ride to Bi-Mart to shop. The detectives knew that the quantity of methamphetamine to be purchased was enough to warrant the presence of the sale's provider. Unlike Kingsmith , where two cars had stopped to meet for unknown reasons, defendant was present in the midst of what was planned as a drug transaction. After Holdorf , the circumstances related to Collier are pertinent when evaluating reasonable suspicion with regard to defendant's potential involvement in criminal activity.
The detectives had reason to think that defendant was involved. Considering all those facts, the trial court could properly conclude that Hansen had reasonable suspicion to extend the stop of defendant for further inquiry. We conclude that the trial court did not err in denying defendant's motion to suppress with regard to the extension of the stop.
Next, we consider whether defendant's disclosure of methamphetamine in his shirt pocket was inadmissible as the product of the unlawful seizure of his knife. As noted, Officer Klopenstein remained with defendant, noticed a clip, and took from defendant his knife. At the suppression hearing, Klopenstein did not testify and the detectives did not offer a justification for why Klopenstein seized the knife. On appeal, the state conceded, as defendant argued, that, without proof that an established exception to the warrant requirement applied, a warrantless seizure is presumed to be unlawful. Stevens , 311 Or. at 126, 806 P.2d 92. Defendant argues that his subsequent disclosure of methamphetamine in his pocket was the product, in part, of that unlawful seizure, rendering his disclosure or admissions inadmissible.[3]
*839 When, after an illegal search or seizure, a defendant challenges the validity of the defendant's subsequent consent to a search, the state bears the burden of demonstrating that the consent was voluntary and was not the product of police exploitation of the illegal search or seizure. State v. Unger , 356 Or. 59, 74-75, 333 P.3d 1009 (2014). As the Supreme Court has explained:
"To determine whether the state has met its burden of showing that defendant's consent was not the product of the unlawful police conduct, we consider the totality of the circumstances, including the temporal proximity between that misconduct and the consent, and the existence of any intervening or mitigating circumstances. We also consider the nature, purpose, and flagrancy of the misconduct."
Id. at 88, 333 P.3d 1009. In Unger , the court determined that a defendant's consent to search can be shown to be unrelated or only tenuously related to the prior illegal police *430 conduct even when prompted by an officer's request. Id . at 79, 333 P.3d 1009. But, even before Unger , defendant's unprompted consent could be found to be an intervening circumstance that indicated a tenuous connection to the illegal police conduct-and that meant consent could be found to be valid. Id . at 78-79, 333 P.3d 1009 (citing State v. Hall , 339 Or. 7, 34, 115 P.3d 908 (2005), State v. Rodriguez , 317 Or. 27, 41-42, 854 P.2d 399 (1993), and State v. Kennedy , 290 Or. 493, 504, 506, 624 P.2d 99 (1981) ).
In this case, the stop of defendant was permissibly extended due to reasonable suspicion that he was involved in the planned drug transaction. While Hansen had stepped away from defendant the first time to retrieve a cell phone, Hansen looked back to see defendant touching his shirt pocket, which was "indexing" behavior, indicating possible drug possession. Hansen's second patdown revealed a lump in defendant's shirt pocket, which defendant claimed was a coin purse. All this happened before Hansen stepped away a second time and before Klopenstein noticed and seized defendant's knife. Consequently, Hansen's suspicion that defendant's shirt pocket could contain evidence arose before Klopenstein seized defendant's knife. After Hansen stepped away again to talk to Collier, discovering Collier's possession of drugs, Hansen returned to defendant to pursue the inquiry of defendant. Collier's possession of drugs gave *840 Hansen further reason to inquire of defendant. Nothing in those facts suggests that Klopenstein's seizure of defendant's knife caused Hansen to suspect that defendant possessed drugs.
Likewise, nothing in those facts suggests that the detectives employed the seizure of the knife to secure defendant's consent to disclose the contents of his shirt pocket. Before the knife was seized, defendant had refused consent for a search of the car. Even after Hansen returned again to inquire of the contents of defendant's shirt pocket, defendant said that he did not possess any drugs. Those facts demonstrate that defendant's resistance was not overcome by seizure of the knife. It was when Hansen called for a K-9 unit to sniff the car that defendant interrupted Hansen's call to volunteer that he would empty his pockets. When Hansen did not believe that defendant had, in fact, emptied his shirt pocket, defendant finally admitted that he had drugs and allowed Hansen to remove the methamphetamine from his pocket. Thus, partly prompted and unprompted, defendant voluntarily disclosed his possession of methamphetamine.
We conclude that the state carried its burden to show that the detectives did not exploit the seizure of defendant's knife so as to cause defendant to make that disclosure. The trial court properly concluded that, under the totality of the circumstances, defendant's disclosure was not the product of prior illegal police conduct. See Unger , 356 Or. at 93-34, 333 P.3d 1009 (affirming denial of motion to suppress); State v. Lorenzo, 356 Or. 134, 335 P.3d 821 (2014) (same).
The trial court properly denied defendant's motion to suppress evidence.
Affirmed.

See State v. Bates , 304 Or. 519, 524, 747 P.2d 991 (1987) (explaining officer safety principles).

Because defendant develops his argument focused on Article I, section 9, of the Oregon Constitution, we do likewise. Defendant develops no argument to suggest a different conclusion would be reached under the Fourth Amendment. The analysis of defendant's rights under the Oregon and federal constitutions are substantially the same for these purposes. Holdorf , 355 Or. at 818-19, 333 P.3d 982.

Because we have rejected defendant's argument that the extended stop was unlawful, we reject defendant's argument that the extension rendered his subsequent disclosures inadmissible.